100 N.Y.2d 893 (2003)
801 N.E.2d 326
769 N.Y.S.2d 106
CAMPAIGN FOR FISCAL EQUITY, INC., et al., Appellants,
v.
STATE OF NEW YORK et al., Respondents.
Court of Appeals of the State of New York.
Argued May 8, 2003.
Decided June 26, 2003.
*894 Simpson Thacher & Bartlett, New York City (Joseph F. Wayland, David E. Massengill, William T. Russell, Jr., Jonathan K. Youngwood, Daniel H. Tabak, Elaine M. Divelbliss, Nihara K. Choudhri, Jason S. Stone and Jill L. Goldberg of counsel), and Michael A. Rebell Associates (Michael A. Rebell, Molly A. *895 Hunter and Deborah A. Widiss of counsel), for appellants.
Eliot Spitzer, Attorney General, Albany (Daniel Smirlock, Caitlin J. Halligan, Denise A. Hartman, Melanie L. Oxhorn, Jean Lin, Deon Nossel and Robert M. Blum of counsel), for respondents.
*896 Michael A. Cardozo, Corporation Counsel, New York City (Elizabeth S. Natrella and Leonard Koerner of counsel), for City of New York and others, amici curiae.
*897 Arthur N. Eisenberg, New York City, Christopher Dunn and Donald Shaffer for New York Civil Liberties Union, amicus curiae.
DeGraff, Foy, Holt-Harris & Kunz, LLP, Albany (Robert E. Biggerstaff and Amy Quandt of counsel), for New York State Association of Small City School Districts, Inc., amicus curiae.
*898 DeGraff, Foy, Holt-Harris & Kunz, LLP, Albany (Robert E. Biggerstaff and Amy Quandt of counsel), for New York State Coalition for 853 Schools, Inc., amicus curiae.
*899 Denise C. Morgan, New York City, for Black, Puerto Rican and Hispanic Legislative Caucus and others, amici curiae.
Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York City (Roberta A. Kaplan, Daniel R. Garodnick and David W. Wang of counsel), for Partnership for New York City, Inc., amicus curiae.
Ferrara, Fiorenza, Larrison, Barrett & Reitz, P.C., East Syracuse (Benjamin J. Ferrara and Norman H. Gross of counsel), for Midstate School Finance Consortium, amicus curiae.
Betsey Boardman Swan, Menands, for League of Women Voters of New York State, Inc., amicus curiae.
*900 Michael J. Looby, Rochester, and Harter, Secrest & Emery LLP (Carol E. Heckman and Carol L. O'Keefe of counsel), for Rochester City School District, amicus curiae.
Stroock & Stroock & Lavan LLP, New York City (Alan M. Klinger and Adam S. Grace of counsel), and Carol L. Gerstl for United Federation of Teachers, amicus curiae.
Davis Polk & Wardwell, New York City (Sharon Katz, Thomas Childs, Aisha Christian-Royall, Monica Lamb, Tyson Pratcher and David B. Toscano of counsel), for Alliance for Quality Education and others, amici curiae.
*901 Hogan and Hartson, L.L.P., New York City (Adam J. Heft of counsel), and Patricia A. Brannan, Washington, D.C., for Council of the Great City Schools, amicus curiae.
Jay Worona, Latham, and Pilar Sokol for New York State School Boards Association, Inc., and another, amici curiae.
Judges SMITH, CIPARICK and ROSENBLATT concur with Chief Judge KAYE; Judge SMITH concurs in a separate concurring opinion; Judge READ dissents in another opinion; Judge GRAFFEO taking no part.

OPINION OF THE COURT
Chief Judge KAYE.
We begin with a unanimous recognition of the importance of education in our democracy. The fundamental value of education is embedded in the Education Article of the New York State Constitution by this simple sentence: "The legislature shall provide for the maintenance and support of a system of *902 free common schools, wherein all the children of this state may be educated" (NY Const, art XI, § 1). Plaintiffs claim that the State has violated this mandate by establishing an education financing system that fails to afford New York City's public schoolchildren the opportunity guaranteed by the Constitution. Plaintiffs additionally claim that the State's method of school funding in New York City violates their rights under United States Department of Education regulations pursuant to title VI of the Civil Rights Act of 1964 (42 USC § 2000d et seq.; 34 CFR 100.3 [b] [2]).
This case does not arrive before us on a blank slate. On June 15, 1995precisely eight years agowe denied the State's motion to dismiss plaintiffs' claims, thereby resolving three issues of law that now become the starting point for our decision (Campaign for Fiscal Equity v State of New York, 86 NY2d 307 [1995] [CFE]).
First, echoing Board of Educ., Levittown Union Free School Dist. v Nyquist (57 NY2d 27 [1982] [Levittown]), in CFE we recognized that by mandating a school system "wherein all the children of this state may be educated," the State has obligated itself constitutionally to ensure the availability of a "sound basic education" to all its children. (86 NY2d at 314.) Second, we made clear that this Court is responsible for adjudicating the nature of that duty, and we provided a template, or outline, of what is encompassed within a sound basic education. And third, we concluded from the pleadings that plaintiffs had alleged facts that, if proved, would constitute a violation of the State's constitutional duty as well as the federal regulations. The actual quality of the educational opportunity in New York City, the correlation between the State's funding system and any failure to fulfill the constitutional mandate, and any justification for claimed discriminatory practices involve fact questions. For that reason, we remitted the matter to the trial court for development of the record. Extensive discovery ensued. Trial commenced on October 12, 1999 and the last witness left the stand seven months later, on May 15, 2000.
Based on the testimony of 72 witnesses and on 4,300 exhibits, the trial court on January 9, 2001 determined that the State over many years had consistently violated the Education Article of the Constitution. In keeping with our directive, the trial court first fleshed out the template for a sound basic education that we had outlined in our earlier consideration of the issue. To determine whether the State actually satisfied that standard the court then reviewed the various necessary *903 instructional "inputs" we had identified, and concluded that in most of these the New York City schools were deficient. The trial court further held that the "outputs"test results and graduation rateslikewise reflected systemic failure and that the State's actions were a substantial cause of the constitutional violation. Finally, the court found a violation of title VI, and directed defendants to put in place systemic reforms.
A divided Appellate Division reversed, on the law and facts. The majority rejected the trial court's definition of a sound basic education, as well as the bulk of Supreme Court's findings of fact concerning inputs, outputs and causation. Lastlyand on this point the panel was unitedthe Appellate Division concluded that plaintiffs' title VI claim failed in light of Alexander v Sandoval (532 US 275 [2001]), which postdated the trial court's decision. Plaintiffs appealed to us as of right on constitutional grounds.
Plaintiffs' appeal presents various questions of law, but one is paramount: whether the trial court correctly defined a sound basic education. Furtherin light of the Appellate Division's express and implicit substitution of its findings of fact for those of the trial court regarding the inputs, outputs and causationwe must determine which court's findings more nearly comport with the weight of the credible evidence (see CPLR 5501 [b]). We now modify, affirming for reasons stated by the Appellate Division so much of the decision as dismissed plaintiffs' title VI claim,[1] and otherwise reversing the Appellate Division's order (see, by contrast, Paynter v State of New York, 100 NY2d 434 [2003] [decided today]).

I. Overview
At the time of trial, the New York City public school system comprised nearly 1,200 schools serving 1.1 million children and employing a staff of over 135,000, including 78,000 teachers (see generally 187 Misc 2d 1, 19-23 [2001]; 295 AD2d 1, 5-6 [2002]). Some 84% of City schoolchildren were racial minorities; *904 80% were born outside the United States; and 16% were classified as Limited English Proficient (LEPpersons who speak little or no English)most of the state's students in each of these categories. Upwards of 73% were eligible for the federal free or reduced price lunch program; 442,000 City schoolchildren came from families receiving Aid to Families with Dependent Children; and 135,000 were enrolled in special education programs.
The New York City public school system was and is supervised by the Board of Education and its Chancellor (see Education Law § 2590-b [1]; §§ 2590-g, 2590-h).[2] The system is divided into 32 geographically-based community school districts to provide elementary and middle school education; six geographically-based high school districts; and four nongeographical districts. At the time of trial, elected community school boards supervised the community school districts, and had done so since 1969. Statewide, oversight of the public school system is vested in the Regents of the University of the State of New York (see NY Const, art XI, § 2; Education Law § 207). The State Education Department (SED) and Commissioner of Education supervise and manage the State's public schools, promulgating regulations and determining teaching standards and curricula, among other things.
Neither the Regents nor the SED is responsible, however, for the day-to-day operation of the schools or for their funding. Rather, a combination of local, state and federal sources generates school funding. Almost half of the state aid component consists of operating aid, which is allocated using a complex statutory formula that apportions various categories of aid based on a district's combined wealth ratiowhich measures its ability to generate revenueand student attendance (see Education Law § 3602). The statute contains extensive prescriptions regarding how districts may use funds, and it is perhaps the proliferation of highly specific aid categories that most differentiates the current section 3602 from its shorter, simpler predecessors (see e.g. L 1962, ch 657, § 3).
Every year, pursuant to Education Law § 215-a, the Board of Regents and the SED submit a report to the Governor and Legislature on the educational status of the State's schools. *905 The most recent of these "655 Reports" at the time of trial that of April 1999provides a comprehensive statistical view of the funding system as of the 1996-1997 school year, the last year for which the record provides such a complete picture. That year, statewide, the State provided 39.9% of all public school funding$10.4 billion out of a total of $26 billion while districts provided 56% and the federal government four percent. These figures represented an investment of $9,321 per pupil, $3,714 of it by the State. Per-pupil expenditures in the New York City public schools, at $8,171, were lower than in three quarters of the State's districts, including all the other "large city" districts, as classified by the SED. The State's dollar contribution to this figure was also lower, at $3,562, than its average contribution to other districts; and the City's, at about $4,000, was likewise lower than the average local contribution in other districts.

II. The Standard
In CFE we equated a sound basic education with "the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (86 NY2d at 316). We thus indicated that a sound basic education conveys not merely skills, but skills fashioned to meet a practical goal: meaningful civic participation in contemporary society. This purposive orientation for schooling has been at the core of the Education Article since its enactment in 1894. As the Committee on Education reported at the time, the "public problems confronting the rising generation will demand accurate knowledge and the highest development of reasoning power more than ever before * * *" (2 Documents of 1894 NY Constitutional Convention No. 62, at 4).
In keeping with this core constitutional purpose and our direction further to develop the template, the trial court took evidence on what the "rising generation" needs in order to function productively as civic participants, concluding that this preparation should be measured with reference to the demands of modern society and include some preparation for employment (187 Misc 2d at 16). The Appellate Division also recognized that our "term `function productively' does imply employment" (295 AD2d at 8), and we agree with both parties and both lower courts that an employment component was implicit in the standard we outlined in CFE. Nevertheless, the parties dispute the nature of the employmentand of civic participation *906 generallyfor which a sound basic education should prepare children, as well as the nature of the instruction necessary to achieve such preparation. We address each of these areas of dispute in turn.
First, as to employment, the Appellate Division concluded that the trial court "went too far" in construing the ability to "function productively" as the ability to obtain "competitive employment" or, indeed, as anything more than "the ability to get a job, and support oneself, and thereby not be a charge on the public fisc" (295 AD2d at 8). More is required. While a sound basic education need only prepare students to compete for jobs that enable them to support themselves, the record establishes that for this purpose a high school level education is now all but indispensable. As plaintiffs' education and economics expert Dr. Henry Levin testified, manufacturing jobs are becoming more scarce in New York and service sector jobs require a higher level of knowledge, skill in communication and the use of information, and the capacity to continue to learn over a lifetime. The record showed that employers who offer entry-level jobs that do not require college increasingly expect applicants to have had instruction that imparts these abilities, if not a specific credential.
Second, as to other aspects of civic participation, the difference between the trial court and the Appellate Division centers on our statement in CFE that a sound basic education should leave students "capable of voting and serving on a jury" (86 NY2d at 316). The State's expert on educational psychology, Dr. Herbert Walberg, testified that pattern jury instructions and newspaper articles typically feature vocabulary and sentence length comparable to those of texts eighth-graders are expected to be able to read. Based on this testimony, the Appellate Division concluded that the skills necessary for civic participation are imparted between eighth and ninth grades (295 AD2d at 8). The trial court, by contrast, concluded that productive citizenship "means more than just being qualified to vote or serve as a juror, but to do so capably and knowledgeably" (187 Misc 2d at 14 [emphasis in original])to have skills appropriate to the task.
We agree with the trial court that students require more than an eighth-grade education to function productively as citizens, and that the mandate of the Education Article for a sound basic education should not be pegged to the eighth or ninth grade, or indeed to any particular grade level. In CFE we pointed to voting and jury service because they are the civic responsibilities *907 par excellence. For reasons founded in the American historical experience, the statutory requirements for participation in those activities are aimed at being inclusive. Indeed, the latest amendment of Judiciary Law § 510the juror qualification statuteremoved requirements based on jurors' literacy (see L 1995, ch 86, § 3). Yet it cannot reasonably be supposed that the demands of juror service, and any related demands on the City schools, have become less rigorous, or that the concept of a sound basic education would not include literacy.
Finally, with these goals in mind, we come to the dispute over the kind and amount of schooling children need in order to be assured of the constitutional minimum of educational opportunity. In CFE we refrained from addressing this problem in detail, simply setting forth the "essentials":
"Children are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas" (86 NY2d at 317).
As we further explained, many of the more detailed standards established by the Board of Regents and Commissioner of Education "exceed notions of a minimally adequate or sound basic education," so that proof that schools do not comply with such standards "may not, standing alone, establish a violation of the Education Article" (id.). The trial court, accordingly, declined to fix the most recent, and ambitious, statement of educational goalsthe Regents Learning Standards, adopted in 1996as the definition of a sound basic education (187 Misc 2d at 12). As the trial court observed, so to enshrine the Learning Standards would be to cede to a state agency the power to define a constitutional right.
Although some amici nevertheless urge us to adopt the Learning Standards as the definition of a sound basic education, plaintiffs make no such request. Rather, they contend that children are entitled to a meaningful high school education, *908 one that provides the essentials we listed. Defendants maintain that plaintiffs are trying to set the requirements for a high school diploma as the constitutional floor, and thereby to make mastery of the Learning Standardswhich are being phased in as the basis for a high school diploma (see 8 NYCRR 100.5)the test of a sound basic education after all. We do not construe plaintiffs' arguments as a request for a rule tied to whatever diploma requirement the Regents promulgate, however high; nor do plaintiffs need such a rule to prevail.
The issue to be resolved by the evidence is whether the State affords New York City schoolchildren the opportunity for a meaningful high school education, one which prepares them to function productively as civic participants. This is essentially the question the trial court addressed, and we conclude that the Appellate Division erred to the extent that it founded a judgment for defendants upon a much lower, grade-specific level of skills children are guaranteed the chance to achieve.

III. The Evaluation
To determine whether New York City schools in fact deliver the opportunity for a sound basic education, the trial court took evidence on the "inputs" children receiveteaching, facilities and instrumentalities of learningand their resulting "outputs," such as test results and graduation and dropout rates. This organization of the facts follows naturally from our summary of the "essentials" in CFE and was not disputed by the Appellate Division.[3]

*909 A. Input
Teaching. The first and surely most important input is teaching. The trial court considered six measures of teacher qualityincluding certification rates, test results, experience levels and the ratings teachers receive from their principals and concluded that the quality of New York City schoolteachers is inadequate, despite the commendable, even heroic, efforts of many teachers. The Appellate Division reached a contrary conclusion based on its perception that principals' reviews of the teachers they supervise are the best indication of teaching ability (295 AD2d at 14). But plaintiffs' expert on the labor market for teachers, Dr. Hamilton Lankford, testified authoritatively regarding other factors that are probative of teacher quality, and several experienced administrators testified that principals' reviews tend to conceal teacher inadequacy because principals find it difficult to fire bad teachers and to hire better ones. In our view, the Appellate Division improperly narrowed the inquiry here. Considering all of the factors, we agree with the trial court's findings and its conclusion that the teaching is inadequate.
The 1999 655 Report noted that schools with the highest percentages of minority children "have the least experienced teachers, the most uncertified teachers, the lowest-salaried teachers, and the highest rates of teacher turnover." The same report showed that well over half of the State's minority children attended New York City schools; that 84% of New York City schoolchildren were minorities; and that most of these children are poor. Taken together, these and other facts and statements in the 655 Report amount to an admission by the state agencies responsible for education thatwith respect to teacher experience and retention, certification and payNew York City schools are inferior to those of the rest of the state.
To be sure, the Education Article guarantees not equality but only a sound basic education (see Levittown, 57 NY2d at 48). But as Judge Levine observed in his concurrence in CFE, "the constitutional history of the Education Article shows that the objective was to `make[] it imperative on the State to provide adequate free common schools for the education of all of the children of the State' and that the new provision would have an impact upon `places in the State of New York where the common schools are not adequate'" (86 NY2d at 327 [Levine, J., concurring], quoting 3 Revised Record of Constitutional Convention of 1894, at 695 and adding emphasis).
*910 The 655 Report indicates a mismatch between student need in New York City and the quality of the teaching directed to that need, and it is one authoritative source of facts showing the extent of the mismatch. The report, for instance, shows that in 1997 17% of New York City public schoolteachers either were uncertified or taught in areas other than those in which they were certified. The trial court noted this fact and evidence that uncertified and inexperienced teachers tend to be concentrated in the lowest performing schools. Notably, Dr. Lankford demonstrated not only that New York City schools had the largest percentage of teachers with two or fewer years' experience but also that this percentage was greatestat 17.9%in the quintile of City schools with greatest student need. Classifying teachers who either were uncertified or had less than three years' experience as novice teachers, Dr. Lankford testified that nearly a quarter of all City teachers, and nearly a third of the teachers in the neediest quintile of City schools, were novices. And he reviewed the colossal failure rates of City teachers on the State's certification content-specialty tests, which rise above 40% in mathematics, even for math teachers currently teaching in New York City public schools.
As the trial court's decision shows, the record contains many more facts proving a serious shortfall in teacher quality in New York City schools, proving that this shortfall results from those schools' lack of competitiveness in bidding for and retaining personnel, and proving that better teachers produce better student performance (see 187 Misc 2d at 25-36).
On this last point the testimony of Dr. Ronald Ferguson is particularly revealing. Using data from Texaswhere all teachers are testedDr. Ferguson demonstrated that in districts where teachers perform badly on teacher certification tests, student performance declines as student grade level risesand, conversely, that where teachers test well, student performance at higher grade levels surpasses student performance at lower grade levels. Thus, the longer students are exposed to good or bad teachers, the better or worse they perform. Based on evidence offered by Dr. Lankford, Dr. Ferguson projected that the same correlation would apply in New York. Defendants' expert, Dr. Eric Hanushek, challenged Dr. Ferguson's conclusions, but the trial court rejected this challenge and the Appellate Divisionthough it referred to Dr. Ferguson's testimonydid not rest any of its own contrary findings on Dr. Hanushek's testimony.
*911 In sum, we conclude that the Appellate Division erred in relying solely on principals' evaluations, and we agree with the trial court's holdings that teacher certification, test performance, experience and other factors measure quality of teaching; that quality of teaching correlates with student performance; and that New York City schools provide deficient teaching because of their inability to attract and retain qualified teachers.
School Facilities and Classrooms. As we noted in CFE, children are entitled to "classrooms which provide enough light, space, heat, and air to permit children to learn" (86 NY2d at 317). The trial court divided this furtherconsidering first the physical plant of New York City schools, and then the specific problem of overcrowding and class sizeand concluded that New York City schools are deficient. The court conceded, however, that the harmful effect of physical deficiencies of the first kind on student performance is difficult to measure. The Appellate Division took note of this concession, dismissed as "anecdotal" plaintiffs' evidence of "leaky roofs, deficient heating, and other problems," and credited testimony that "all immediately hazardous conditions had been eliminated" (295 AD2d at 10).
Eliminating immediate hazards is not the same as creating an environment conducive to learning, and the record contains much evidence about deficient school infrastructure. Nevertheless, on this record it cannot be said that plaintiffs have proved a measurable correlation between building disrepair and student performance, in general.[4]
On the other hand, plaintiffs presented measurable proof, credited by the trial court, that New York City schools have excessive class sizes, and that class size affects learning. Even in the earliest yearsfrom kindergarten through third grade over half of New York City schoolchildren are in classes of 26 *912 or more, and tens of thousands are in classes of over 30. As the trial court noted, federal and state programs seek to promote classes of 20 or fewer, particularly in the earliest years, and plaintiffs' experts testified on the advantage of smaller classes. As the 1999 655 Report shows, New York City elementary school classes average five more pupils than those of other schools statewide excluding Buffalo, Rochester, Syracuse and Yonkers.
Although the Appellate Division found "no indication that students cannot learn in classes consisting of more than 20 students" (295 AD2d at 11), plaintiffs' burden was not to prove that some specific number is the maximum class size beyond which children "cannot learn." It is difficult to imagine what evidence could ever meet a burden so formulated; nothing in CFE required plaintiffs to do so. Rather, plaintiffs alleged "fact-based * * * inadequacies" in educational inputs, and we held that the State's failure to provide the opportunity to obtain "fundamental skills" would constitute a violation of the Education Article (86 NY2d at 319). Accordingly, plaintiffs had to show that insufficient funding led to inadequate inputs which led to unsatisfactory results.
Plaintiffs' education evaluation statistics expert Dr. Jeremy Finn showedon the basis of the Tennessee Student Teacher Achievement Ratio (STAR) project and related researchthat, holding other variables constant, smaller class sizes in the earliest grades correlate with better test results during those years and afterwards (187 Misc 2d at 52-53). The trial court found that the State's expert Dr. Hanushek failed to rebut these conclusions, and the Appellate Division, mistakenly addressing a nonexistent claim "that classes of over 20 students are unconstitutional" (295 AD2d at 11), set forth no acceptable basis to disturb the trial court's finding.[5] We conclude that plaintiffs' evidence of the advantages of smaller class sizes supports the inference sufficiently to show a meaningful correlation between the large classes in City schools and the outputs to which we soon turn. In sum, the Appellate Division erred in concluding that there was not "sufficient proof" (295 AD2d at 11) that large class sizes negatively affect student performance in New York City public schools.
*913 Instrumentalities of Learning. The final input is "instrumentalities of learning," including classroom supplies, textbooks, libraries and computers. The courts below agreed that the textbook supply is presently adequate and the evidence on classroom supplies is inconclusive. On the other hand, evidence including the latest 655 Report showed that New York City schools had about nine library books per studenthalf as many as schools statewide excluding the City, and just under half the number recommended by the American Library Association. In light of Levittown, the intrastate inequality does not prove anything in itself, and a library association might be expected to advocate book purchases at levels exceeding the constitutional floor. But in holding that the library books in New York City schools are "inadequate in number and quality" (187 Misc 2d at 57) the trial court clearly relied on the abundant testimony on the adequacy of the books for pedagogical purposes rather than on purely numerical intrastate comparisons.
The unrebutted testimony indicated that the books in City school libraries are old and not integrated with contemporary curricula. The Appellate Division suggested that school libraries simply consist of "classics" rather than "multicultural" books (295 AD2d at 12), but the record contains not one scintilla of evidence that antiquated books in City school libraries are "classics." The Appellate Division thus gave no factual basis for its disagreement with the trial court that the library books in New York City schools are inadequate in quality.
The record concerning computers is similar, establishing that some exposure to them has become essential and that City schools not only have about half as many computers per student as all other New York schools, but also have aging equipment that, in some cases, simply cannot support presently-available software. The Appellate Division speculated that old equipment might be used "for introductory classes" (295 AD2d at 11), but this possibility was not even advocated by the State and, like the "classic" outdated library books, has no record support at all. While we hesitate to overstate the importance of libraries and computers relative to other inputs, we conclude that as to these two instrumentalities of learning the trial court's findings again better comport with the weight of the evidence, and support its conclusion that the New York City schools are deficient in instrumentalities of learning.
In sum, considering all of the inputs, we conclude that the trial court's findings should be reinstated, as indicated, and *914 that the educational inputs in New York City schools are inadequate. There are certainly City schools where the inadequacy is not "gross and glaring" (Levittown, 57 NY2d at 48). Some of these schools may even be excellent. But tens of thousands of students are placed in overcrowded classrooms, taught by unqualified teachers, and provided with inadequate facilities and equipment. The number of children in these straits is large enough to represent a systemic failure. A showing of good test results and graduation rates among these studentsthe "outputs"might indicate that they somehow still receive the opportunity for a sound basic education. The showing, however, is otherwise.

B. Outputs
School Completion. Concerning the first output, school completion, the proof revealed that of those New York City ninth graders who do not transfer to another school system, only 50% graduate in four years, and 30% do not graduate or receive a general equivalency degree (GED) by the age of 21, when they cease to be eligible for free public education. This rate of school completion compares unfavorably with both state and national figures, and the trial court considered it symptomatic of "system breakdown" (187 Misc 2d at 63). The Appellate Division concluded that "there was no evidence quantifying how many drop-outs fail to obtain a sound basic education" (295 AD2d at 15). That conclusion follows from the Appellate Division's premise that a sound basic education is imparted by eighth or ninth grade. A sound basic education, however, means a meaningful high school education. Under that standard, it may, as a practical matter, be presumed that a dropout has not received a sound basic education. In any event the evidence was unrebutted that dropouts typically are not prepared for productive citizenship, as the trial court concluded.[6] The Appellate Division would have required a precise quantitative division between those dropouts who somehow are adequately *915 prepared and those who are not, but such a requirement is nowhere to be found in CFE.
The State argues nonetheless that it is responsible only to provide the opportunity for a sound basic education and cannot be blamed if some studentsperhaps those who enter New York City schools after years of schooling in another countrydo not avail themselves of the opportunity it provides. As the trial court correctly observed, this opportunity must still "be placed within reach of all students," including those who "present with socioeconomic deficits" (187 Misc 2d at 63). This observation follows from the constitutional mandate to provide schools wherein all children may be educated, and is consistent with the official position of the Regents and Education Department, as set forth in the 655 Report for 1999, that "[a]ll children can learn given appropriate instructional, social, and health services."
The evidence on why students drop out suggested mainly that the choice to drop out correlates with poor academic performance and, as noted in the 655 Report for 1999, racial minority status and concentrated poverty. The Report further indicated that "dropout rates serve as useful measures of schools' abilities to * * * motivate learning," supporting the commonsense proposition that large dropout rates reflect problems with the schools as well as the students. The trial court properly considered both possibilities and declined to pin the blame solely on the deficits a "troubled child" brings to school (see 187 Misc 2d at 63). There was certainly no proof that dropout rates are high because inordinate numbers of recent immigrants enter the ninth grade unable ever to graduate, though such students may take longer to graduate.[7] Moreover, as the trial court properly observed, "education is cumulative," and the State's hypothesis that poor completion rates stem from the educational deficits of teenage immigrant students does not jibe with the significant evidence that New York City schoolchildren begin to accumulate learning deficits well before high school (187 Misc 2d at 63).
Test Results. The State's main answer to the proof of graduation and dropout rates in City schools consists of evidence that, in any event, test results are not badand this is also *916 where the Appellate Division concentrated its discussion of outputs (295 AD2d at 15-16).
The State's reliance on some favorable standardized test results fails to take into account the full record on examination evidence. In particular, that evidence related to elementary school tests administered statewide and intended to present results with reference to the content appropriate to their grade level: the Pupil Evaluation Program (PEP), which measures individual achievement in reading and mathematics, and the Program Evaluation Test (PET), which measures performance in other subjects. As the trial court explained, the PEP measures student performance relative to a particular score, the state reference point (SRP) (187 Misc 2d at 65). The particular examination used for the PEP reading test during most of the 1990s was the Degrees of Reading Power (DRP). The DRP was replaced in 1998 because it was considered too elementary, in that over 90% of children outside New York City scored above the SRP, so that the exam was inadequate as a means of distinguishing fair from good and good from excellent students. As a means, however, of identifying students in need of remedial attention, the DRP was adequate: a score below the SRP signaled need for improvement.
Between 1994 and 1998, the undisputed evidence showed that upwards of 30% of New York City sixth graders scored below the SRP in reading. Among third graders, 35 to 40% scored below the SRP, while in the rest of the state about 90% scored above. The evidence showed that at the third grade levelwhen children are expected to have learned to reada score at the SRP means a child is barely literate, and hence that over a third of City schoolchildren were functionally illiterate. PET scores in science and social studies showed New York City fourth, sixth and eighth graders invariably in the lowest quartile statewide, and generally between the 10th and 16th percentile. The trial court attached significance to these low PEP and PET scores (187 Misc 2d at 65-66). It also properly recognized thatas alwaysCity-wide averages reflect a process of aggregation wherein some successful schools and districts balance others where even larger numbers of pupils score below the SRP (id.). The Appellate Division set forth no basis to challenge the trial court's analysis of this output, other than its belief that courts should "look at the nation as a whole," rather than to test result comparisons within New York State (295 AD2d at 16). We reject this exclusive focus on national comparisons because the record provides no information *917 on how many students receive a sound basic education nationwide.
The State does rely partly on tests administered statewide. In particular, it cites student performance on the Regents Competency Tests (RCTs), which have historically been administered to 11th graders as a prerequisite for graduation. In 1997-1998, 90% of the New York City schoolchildren who reached 11th grade demonstrated competency in reading and mathematics by passing either the RCTs or the more challenging Regents examinationsa figure not far behind the statewide and suburban averages.
Although the RCTs are no longer used to measure readiness to graduate, this fact alone does not disqualify them as a measure of whether students have received a sound basic education. Nevertheless, as both parties agree, the RCTs assess achievement at only an eighth or ninth grade level in reading and a sixth-to-eighth grade level in math. Thus, while passing the RCTs may show that students have received a sound basic education as defined by the Appellate Division, it does not prove that they have received a meaningful high school education, as the trial court concluded (187 Misc 2d at 61).
Additionally, according to the 655 Report for 1999, City students who took the RCTs in 1997-1998 actually passed at a much lower rate than 90%; 51% passed in math and 72% in English. The Report explains that City schools had adopted a new policy of administering the examinations to ninth rather than 11th graders, and this may account for some of the difference. Since the exams are a diagnostic tool for measuring skills taught in middle school, these results, at most, cast doubt on the results middle schools accomplish, rather than proving that students have received a meaningful high school education. Further, the 1997-1998 11th grade class with the 90% qualification rates consisted of only about 40,000 students, compared to a ninth grade enrollment of over 90,000.
Thus the state's RCT passage ratesaside from proving nothing about high school achievementwould surely be lower, but for the alarming number of students who fall behind or drop out and so do not take the exam. This fact illustrates the need to be cautious in relying on test results, a point we made in CFE even as we recognized that such results have some value (86 NY2d at 317). The trial court properly exercised such caution in its discussion of test results, noting that the failure of many students to be promoted diminishes the value of evidence that students test at grade level (187 Misc 2d at 67).
*918 Apart from the RCTs, the State relies on results from an assortment of commercially-available nationally-normed reading and math tests administered to children in City elementary schools, notably the CTB-Reading (CTB-R) and California Achievement Test (CAT). As the State points out, just under half of all City schoolchildren score at or above the 50th percentile in reading, and a larger number do so in math. Plaintiffs counter that these exams are "norm-referenced" they present information only on how students perform relative to other studentsin contrast to "criterion-referenced" exams, which are informative about how students master content they are expected to know at a given level. Further, plaintiffs argue that national comparisons are irrelevant to the issue of whether New York City public school students have received a sound basic education. The Appellate Division rejected this argument (295 AD2d at 16).
As we have already suggested, the New York Constitution ensures students not an education that approaches the national normwhatever that may bebut a sound basic education. Moreover, CFE makes clear that the measure of a sound basic education is educational contentthe set of "basic literacy, calculating, and verbal skills" children acquire and its fit with the goal of productive citizenship (86 NY2d at 316). Of course, results on a national norm-referenced exam may be translatable into a measure of the skills students must master to have a sound basic education, and we have no cause to doubt that the CTB-R and CAT are designed, as the State argues, to measure mastery of curricula considered important in New York as well as nationally. But during the years reflected in the record, the scores of City schoolchildren on these exams were reportedas the State admitswith reference to a norm rather than to achievement levels. The State has not shown how to translate these results into proof that the schools are delivering a sound basic education, properly defined. Thus, while we cannot say that the CTB-R and CAT exam results have no place in the mix of information on outputs, on this record the Appellate Division erred in according primacy to these results.
In sum, the Appellate Division improperly relied on the RCTs in that they measure a level of proficiency far below a sound basic education, and, as to exams administered to younger children, it erred in relying on national norm-referenced exam results without evidence tying these results to the constitutional standard. We conclude that the trial court's assessment of exam results, like its assessment of completion rates, better *919 comports with the weight of the credible evidence, and supports its conclusion that, whether measured by the outputs or the inputs, New York City schoolchildren are not receiving the constitutionally-mandated opportunity for a sound basic education.

IV. Causation
As we noted in CFE, in order to prevail plaintiffs must "establish a correlation between funding and educational opportunity * * * a causal link between the present funding system and any proven failure to provide a sound basic education to New York City school children" (86 NY2d at 318). The trial court reasoned that the necessary "causal link" between the present funding system and the poor performance of City schools could be established by a showing that increased funding can provide better teachers, facilities and instrumentalities of learning (187 Misc 2d at 68). We agree that this showing, together with evidence that such improved inputs yield better student performance, constituted plaintiffs' prima facie case, which plaintiffs established.
That the trial court's "Causation" section is largely devoted to the State's rebuttal arguments, rather than to plaintiffs' prima facie case, is insignificant, in that the court had already incorporated much of the correlation evidence in its discussion of inputs and outputs, as we have done. The trial court, for instance, concluded that teacher certification rates are one valid measure of teaching quality and are too low in New York City, and it founded these conclusions on evidence establishing the correlation between teacher certification and performance (187 Misc 2d at 26-27). The Appellate Division speculated about the significance of certification and noted that more certified teachers will be hired "[i]n any event" (295 AD2d at 12), but its only clear holding about the quality of instructionwhich we rejectwas that principals' ratings of teachers should be the preeminent measure of pedagogical quality and, implicitly, that by this measure the teaching input is adequate (id. at 13-14). The Appellate Division did nothing to undermine the rest of the trial court's syllogism: that better funded schools would hire and retain more certified teachers, and that students with such teachers would score better.[8] The same is true with respect to class size and instrumentalities of learning.
*920 We thus have no occasion to repeat the evidence establishing plaintiffs' prima facie case regarding the causal connection between better funding, improved inputs and better student results.
The State nevertheless makes several further arguments concerning the correlation between its funding scheme and the educational results. Most of these points, however, more properly concern the apportionment of responsibility among various government actors than causation. In any event, the trial court interpreted CFE correctly when it said that the "law recognizes that there may be many `causal links' to a single outcome, and there is no reason to think that the Court of Appeals 1995 opinion mandates a search for a single cause of the failure of New York City schools" (187 Misc 2d at 92).
Socioeconomic Disadvantage. The State argues that poor student performance is caused by socioeconomic conditions independent of the quality of the schools and better remedied with investment in other resources. The Appellate Division agreed, reasoning that because of "demographic factors, such as poverty, high crime neighborhoods, single parent or dysfunctional homes, homes where English is not spoken, or homes where parents offer little help with homework and motivation * * * more spending on education is not necessarily the answer, and * * * the cure lies in eliminating the socioeconomic conditions facing certain students" (295 AD2d at 16). This is partly an argument about why students fail, which we have rejected in the discussion of outputs. But it is also a distinctly constitutional argument in the sense that choosing between competing beneficial uses of funds is a legislative task.
This is, in fact, the argument that Judge Simons made in his solitary dissent in CFE (86 NY2d at 342-343). Had we accepted the argument, we would have saved everyone considerable effort and expense by dismissing the case on the spot. We did not do so. Decisions about spending priorities are indeed the Legislature's province, but we have a duty to determine whether the State is providing students with the opportunity for a sound basic education. While it may be that a dollar spent *921 on improving "dysfunctional homes" would go further than one spent on a decent education, we have no constitutional mandate to weigh these alternatives. And, again, we cannot accept the premise that children come to the New York City schools ineducable, unfit to learn.
Comparative Spending. The State next argues that per-student expenditures in the New York City schools compare favorably with the average in the United States generally and in other large cities such as Los Angeles, a fact purportedly incompatible with finding "gross and glaring inadequacy" in education (see Levittown, 57 NY2d at 48). The premise is that some expenditure level, if high enough relative to figures nationwide, simply must be "enough," without reference to student need, local costs, and the actual quality of inputs and outputs. This premise, also, is compatible with the interpretation of Levittown endorsed by the dissent in CFE (86 NY2d at 337-338) and apparently also today's dissent (dissenting op at 954). We reject it for much the same reason we rejected exclusive reliance on nationally-normed teststhe record discloses no information on whether those students are receiving a sound basic education.
City Mismanagement. The State's most sustained arguments on causation, however, are based on evidence that the Board of Education mismanages New York City schools and the City itself fails to devote a sufficient part of its revenues to them. The State reasons that if either proposition is true, then the cause of any shortage of educational inputs in City schools is not the state funding system but City bureaucracy.
Specifically, the State argues first that fraud and corruption in the community school boards and City school construction spending, rather than the funding system, are the cause of any shortage of inputs. The trial court rejected these arguments (187 Misc 2d at 92, 94) and the Appellate Division likewise rejected the point about construction spending (295 AD2d at 18) while saying nothing about the community school boards. We thus have no occasion to review either argument.
The State argues second that, corruption aside, the Board of Education mismanages the schools, particularly by referring too many students to special education and placing too many of these children in costly full-time segregated settings. The trial court credited evidence that better special education practices could save City schools between $105 and $185 million annually, though some of these savings would be offset by the *922 greater cost of instructing children with special education needs in a mainstream environment (187 Misc 2d at 96-97). The Appellate Division saw the possible savings mounting to "hundreds of millions of dollars, if not $1 billion" (295 AD2d at 17)a figure exceeding even the $335 million claimed by the State's expert, Dr. Daniel Reschly.
We are thus constrained to accept that some saving on special education is possible, a fact that to some extent undermines plaintiffs' argument that the school funding system is unconstitutional because it leaves New York City schools with insufficient funds to provide a sound basic education. But the magnitude of the savings is in dispute. The Appellate Division appears to have arrived at its "billion" simply by taking the number of full-time special education students, assuming that 80% could be moved to part-time settings, and multiplying the number of students subject to this move by the $10,000 difference between the cost of full-time and part-time placement. No witness for the State sponsored any such calculation, and there was thus no opportunity to test the Appellate Division's assumptions on which it is based.
The available evidence-based conclusions are that overreferral to special education costs City schools somewhere between tens of millions and $335 million. Even the lower of these figures would reflect both resources squandered and the likelihood that many children are badly served and perhaps stigmatized by segregated placements in the special education system in City schools. But, conversely, even savings approaching the higher figure would not necessarily translate dollar-for-dollar into funds free for investment in better inputs, much less into an investment sufficient to relieve the existing systemic educational crisis. In any event, the State points us to no evidence on how much of any savings on special education would be invested in more productive inputs in City schools.
We need not speculate further on the possible saving from special education placement, however, for the State's argument on Board of Education mismanagement fails for a more basic reason. As the trial court and Appellate Division recognized (187 Misc 2d at 81-82; 295 AD2d at 18-19), both the Board of Education and the City are "creatures or agents of the State," which delegated whatever authority over education they wield (City of New York v State of New York, 86 NY2d 286, 289-290 [1995]). Thus, the State remains responsible when the failures of its agents sabotage the measures by which it secures for its citizens their constitutionally-mandated rights.
*923 As our ensuing discussion of remedy shows, various reforms unrelated to financingsome already in the worksmay be part of the package of legislative and administrative measures necessary to ensure a sound basic education to New York City schoolchildren. The requirement stated in CFE, however, was for plaintiffs to "establish a causal link between the present funding system and any proven failure" (86 NY2d at 318), not to eliminate any possibility that other causes contribute to that failure.
Moreover, in every instance where the State has relied on purported political or managerial failings of the City or the Board of Education, closer inspection of the details casts doubt on whether the City could eliminate the failing without the State's help or would have developed the failing without the State's involvement. The issue of special education is illustrative. The trial court held that "the primary causes of New York City's overreferral and overplacement in restrictive settings are a lack of support services in general education and State aid incentives that tended until recently to encourage restrictive placements" (187 Misc 2d at 95). This conclusion is supported by the record and was not disturbed by the Appellate Division. Thus, the State cannot blame overreferral on the institutional culture of the Board of Education and City schools without acknowledging that this culture has evolved to its present condition partly in response to the funding system. At the very least, under CFE, this problem does not constitute a cause sufficiently independent from the State's funding system to overcome plaintiffs' case.
Similar reasoning disposes of the State's argument that the Board of Education's inefficient management of personnel is the supervening cause that, rather than the funding system, accounts for deficiencies in the teaching input. The State points to disturbing evidence that thousands of City schoolteachers do not teach; others teach under contracts that limit their classroom time to under four hours a day; and all are paid according to the same salary schedule, regardless of whether a more flexible system of incentives might be needed, for instance, to induce senior teachers to remain in troubled schools. The Appellate Division characterized such evidence as "the product of collective bargaining agreements, not the manner in which the State funds the City's schools" (295 AD2d at 18). But as the trial court found, "the allegedly shorter workday of New York City's public school teachers has not provided the City an advantage in the competition for qualified teachers" *924 (187 Misc 2d at 36). Such considerations, as well as the simple constitutional principle that the State has ultimate responsibility for the schools, counsel us against the State's rebuttal arguments on causation.
Local Funding. Of the State's rebuttal arguments, one more requires special attention. The State argues that the City actually has a greater capacity to fund education from local revenues than many local governments statewide, yet fails to make anything like the same "tax effort" that other localities make. Indeed, the State marshals evidence that when the State injects funds pursuant to formulas intended to compensate for inequalities in local school funding, the City deducts proportionately from its own contribution, leaving the school budget unimproved.
The trial court found evidence to support this assertion; noted unique pressures on the City budget and other factors that account for some of the difference in tax effort; and concluded that the ultimate responsibility to address this problem still lay with the State (187 Misc 2d at 97-99). The Appellate Division expressly rejected the State's contention that "any inadequacy in funding is the fault of the City," noting that "the State exerts extensive control over the City, including taxes that may be levied and debts that may be incurred," but reflecting that the remedy, rather than "requiring the State to write out a check every time the City underfunds education" may be for the State to "require the City to maintain a certain level of education funding" (295 AD2d at 18, 19).
Here, therefore, there is next to no dispute. If the State believes that deficient City tax effort is a significant contributing cause to the underfunding of City schools, it is for the Statethrough a combination of enforcing existing laws such as the Stavisky-Goodman Law (Education Law § 2576 [5-a]) and new legislationto consider corrective measures. This possibility pertains to the remedy, not to the definition of plaintiffs' burden of proof on causation orwhat amounts to the same thing in practiceto the determination of whether plaintiffs' cause of action is viable.
In CFE Judge Simons argued otherwise, citing declining City contributions to the school budget as part of his reason why plaintiffs' claim should have been dismissed (86 NY2d at 334, 340-341). The State essentially tries to revive this argument, contending that plaintiffs must lose because they have not shown why their grievance could not be addressed by *925 measures less drastic than constitutional adjudication: greater effort by the City, whether voluntary or statutory. The analysis we have already outlined regarding responsibility for special education placement and teacher employment practices applies here again. Relative to the State, the City has "absolutely no control" over the school funding system (City v State, 86 NY2d at 295) and while any failings may be considered in determining the remedy, they do not constitute a supervening cause sufficient to decide the case for the State. Plaintiffs have established the causation element of their claim.

V. The Remedy
Challenging as the previous issues are, in complexity they pale by comparison to the final question: remedy. Pointing to a long history of State inaction despite its knowledge of the inadequacy of the education finance system, plaintiffs ask us to initiate a legislative/judicial dialogue by issuing guidelines to the Legislature for restructuring the system and directingwith strict timetablesthat the necessary resources be provided. The State, by contrast, urges that, should a constitutional violation be found, the Court simply direct the proper parties to eliminate the deficiencies.
Both extremes are problematic. We are, of course, mindfulas was the trial courtof the responsibility, underscored by the State, to defer to the Legislature in matters of policymaking, particularly in a matter so vital as education financing, which has as well a core element of local control. We have neither the authority, nor the ability, nor the will, to micromanage education financing. By the same token, in plaintiffs' favor, it is the province of the Judicial branch to define, and safeguard, rights provided by the New York State Constitution, and order redress for violation of them. Surely there is a remedy more promising, and ultimately less entangling for the courts, than simply directing the parties to eliminate deficiencies, as the State would have us do.
The trial court ordered the State first to ascertain the actual cost of providing a sound basic education statewide, and then reform the system to (1) ensure that every school district has the resources necessary to provide a sound basic education; (2) take into account variations in local costs; (3) provide sustained and stable funding in order to promote long-term planning by school districts; (4) provide "as much transparency as possible so that the public may understand how the State distributes school aid"; and (5) ensure a system of accountability to measure *926 the effect of reforms implemented (187 Misc 2d at 115). We take it that the fourth, "transparency" requirement would relate to the process by which funds are allocated in Albany, while the fifth, "accountability" requirement relates to the evaluation of schools and of programs designed to improve them.
The State objects to each of these guidelines on various grounds, but a common theme is that existing reforms already address existing problems. Indeed, ongoing federal, state and City programsseveral initiated after the close of triallikely constitute the most ambitious education reform in recent years. Starting at the federal level, the No Child Left Behind Act of 2001 (Pub L 107-110, 115 US Stat 1425 [2002]), amending the Elementary and Secondary Education Act of 1965 (20 USC § 6301 et seq.), now requires states to establish mechanisms to identify schools where student performance does not meet standards set by each state. To qualify for federal education funding, states must give children who attend such schools remedial options, such as tutoring or the right to transfer to a better school.
As part of a statewide procedure to identify schools in need of improvement, a number of City schools have been designated as Schools Under Registration Review (SURR) (see 8 NYCRR 100.2 [p]). This SURR list consists of those schools the Commissioner of Education deems farthest from meeting accountability criteria tied to the Learning Standards (8 NYCRR 100.2 [p] [4], [7]). Such schools are required to implement a "corrective action plan" and undergo monitoring; if they do not improve, they may be declared "unsound" (8 NYCRR 100.2 [p] [5]). In New York City, some SURR schools are removed from their community school district and absorbed into a special "Chancellor's District," where they receive greater resources and supervision. City schools constituted 94 of the 98 SURR schools statewide in 1997-1998, the last year for which the record discloses the number of SURR schools.
In addition to federal and state measures directed at identifying and improving bad schools, significant legislation reorganizing City school governance has been passed since the trial (see L 2002, ch 91; cf. L 2003, chs 6, 15). The legislation enhances the powers and duties of the Mayor of New York City and persons accountable to the Mayornotably the Chancellorto manage school finances and the School Construction Authority, and select and supervise district superintendents and other staff (see Mem of Legis Rep of City of NY, 2002 McKinney's Session Laws of NY, at 1718-1719).
*927 Further, through an ongoing process of reform, the Regents have sought to reduce the employment of uncertified teachers and fortify the requirements for certification (see e.g. 8 NYCRR 80-3.4, 80-5.10 [j]). Likewise, regulations adopted with the Learning Standards and intended to improve the rigor of instruction statewide are close to being fully phased in; for instance, students who entered ninth grade in the 2001-2002 school year no longer had the option to take a "local diploma" (see 8 NYCRR 100.5).
All of these initiatives promise, but await, demonstrable outcomes. We are, of course, bound to decide this case on the record before us and cannot conjecture about the possible effect of pending reforms, at least when determining whether, on the evidence gathered over four years and presented during the seven-month trial, a constitutional violation exists. To the extent that recent reforms enable more students to receive a sound basic education, the State will have the opportunity on remittal to present evidence of such developments.
For similar reasons, we cannot join the dissent in attaching significance to state budget figures showing that in 2002-2003, "the City enrolled 37% of the State's public school population and was allocated 37% of the combined major aid enacted" (dissenting op at 955). Presumably the dissent cites this figure as proof that any inequalities in the funding system have been remedied since trial. But under Levittown and CFE, plaintiffs have a right not to equal state funding but to schools that provide the opportunity for a sound basic education.
Aside from this, even assuming the 2002-2003 figureswhich were not part of the recordwere properly before us, the dissent misstates their significance. They are based on total aidable pupil units (TAPU) (Education Law § 3602 [8] [ii]) and thus would demonstrate not that the City's funding share equaled its enrollment share, but that its funding share equaled its attendance sharea significant difference given evidence that City schools are beset by truancy. Further, the figures do not reflect STAR tax relief, a $2.7 billion program in the year on which the dissent has focused (see New York State Division of the Budget, Education Unit, Description of 2002-03 New York State School Aid Programs, at 30, table II-B). STAR enables homeowners to pay lower property taxes to fund the school system, and enables districts to make up the difference with state funds (see Education Law § 3609-e; RPTL 425). As the trial court said, "New York City receives less STAR aid than localities in the rest of the State" (187 Misc 2d at 86). *928 Finally, of course, the record reflects that a dollar does not go so far in New York City as it goes elsewhere in the State. Thus, even if interdistrict equality were the issue, the 2002-2003 figure cited by the dissent would be far from decisive. We do not explore this point to discredit any choices the Legislature may have made in recent budgets to increase the City's relative allocation of state aid, but simply to emphasize why we focus on record facts whose significance has been properly tested in litigation.
Given all of the jurisprudential constraints discussed above, we begin our review of the trial court's directives by rejecting the provision that the remedy be statewide, and that variations in local costs be taken into account. Courts deal with actual cases and controversies, not abstract global issues, and fashion their directives based on the proof before them. Here the case presented to us, and consequently the remedy, is limited to the adequacy of education financing for the New York City public schools, though the State may of course address statewide issues if it chooses.
Second, we recognize that mechanisms in place, including No Child Left Behind and the SURR process, may already to some extent function as a system of accountability. They are not foolproof, and neither is tied to the definition of a sound basic education. Nevertheless, the State should be able to build on existing criteria to identify the schools in greatest need and set measurable goals for their improvement.
Third, we are not prepared to say as a constitutional matter that a new system must ensure the City "sustained and stable funding." The language of this directive may appear unobjectionable, but in the context of the trial court's decision it implies a need for fundamental change in the relationship between New York City schools and their local tax base. The school districts in New York City, Buffalo, Yonkers, Syracuse and Rochesterunlike every other district in the Stateare "fiscally dependent": they lack the authority to levy property taxes to support education.[9] As the trial court observed, City schools are dependent on municipal revenues, largely from other kinds of taxes more susceptible to the vagaries of the business cycle (187 Misc 2d at 98). It may well be that this susceptibility hinders City schools from developing a more stable budgetary planand that any plan to improve City *929 schools that required better local tax effort, in particular, would need to address this matter. At the same time, the State has suggested that reforms tending to concentrate responsibility with the Mayor of New York City may prove beneficial, and we do not know that a "sustained and stable funding" requirement addressing fiscal dependency would necessarily fit together with such reforms. Accordingly, while the trial court's directive is understandable, we do not make it mandatory.
Fourth, as the foregoing implies, the trial court properly indicated that reforms may address governance as well as the school funding system. Various factors alleged by the State as causes of deficiencies in the schoolsand rejected by us on the ground that the State has ultimate responsibility for the conduct of its agents and the quality of education in New York City public schoolsmay be addressed legislatively or administratively as part of the remedy. We do not think such measures will obviate the need for changes to the funding system, but they may affect the scope of such changes.
Finally, we know of no practical way to determine whether members of the political branches have complied with an order that the funding process become as transparent as possible, and we therefore decline to incorporate such a directive into our order. No one, however, disputes the trial court's description of the existing education funding scheme as needlessly complex, malleable and not designed to align funding with need (187 Misc 2d at 82-90). The causes are worth considering.
As Levittown indicates, the justification for a school funding system based on local taxation is "the preservation and promotion of local control of education" (57 NY2d at 44). Conversely, the purposes of state aid to schools are, according to the SED, to assist school districts in providing an effective education; maintain a state-local partnership in public education; equalize school revenues by providing state aid in inverse proportion to each school district's ability to raise local revenues; and encourage model programs to address the needs of the school community. Clearly these purposes reflect a recognition that inputs should be calibrated to student need and hence that state aid should increase where need is high and local ability to pay is low.
In the case of New York City, student need is high, as is the local ability to pay, as measured by the State's Combined Wealth Ratio. Thus, as the trial court observed, the equalizing elements of the state aid formula do not operate to the *930 advantage of City students, the more so in that the system does not take into account the high cost of running schools in the City (187 Misc 2d at 85-86). And the record supports the trial court's conclusion that funding components that might channel funds to meet the needs of City students fail to make a difference in the end: New York City regularly receives a fixed sharejust under 39%of any funding increase (187 Misc 2d at 89).
Thus, the political process allocates to City schools a share of state aid that does not bear a perceptible relation to the needs of City students. While we do not join the trial court in ordering that the process be made as transparent as possible, we do agree that the funding level necessary to provide City students with the opportunity for a sound basic education is an ascertainable starting point. Once the necessary funding level is determined, the question will be whether the inputs and outputs improve to a constitutionally acceptable level. Other questions about the processsuch as how open it is and how the burden is distributed between the State and Cityare matters for the Legislature desiring to enact good laws.
In view of the alternatives that the parties have presented, we modify the trial court's threshold guideline that the State ascertain "the actual costs of providing a sound basic education in districts around the State" (187 Misc 2d at 115). The State need only ascertain the actual cost of providing a sound basic education in New York City.[10] Reforms to the current system of financing school funding and managing schools should address the shortcomings of the current system by ensuring, as a part of that process, that every school in New York City would have the resources necessary for providing the opportunity for a sound basic education. Finally, the new scheme should ensure a system of accountability to measure whether the reforms actually provide the opportunity for a sound basic education.
The process of determining the actual cost of providing a sound basic education in New York City and enacting appropriate reforms naturally cannot be completed overnight, and we therefore recognize that defendants should have until July 30, 2004 to implement the necessary measures.

*931 VI. Conclusion
We offer these concluding thoughts, against the backdrop of the dissent.
Courts are, of course, well suited to adjudicate civil and criminal cases and extrapolate legislative intent (dissenting op at 959). They are, however, also well suited to interpret and safeguard constitutional rights and review challenged acts of our co-equal branches of governmentnot in order to make policy but in order to assure the protection of constitutional rights. That is what we have been called upon to do by litigants seeking to enforce the State Constitution's Education Article. The task began with Levittown's articulation of the constitutional right to a sound basic educationnot at all a "catchphrase for an inferred constitutional guarantee" (dissenting op at 948-949), but this Court's careful judgment 21 years ago as to what is meant by our State Constitution's promise in the Education Article. CFE built on our definition of the constitutional requirement, adding to the law a determination that the complaint stated a cause of action, and thatif plaintiffs proved their assertions, as they havethey would establish a violation.
Nor is the Court's standard of a sound basic education, articulated both in Levittown and CFE, "illusory" for failing to fix the moment when a meaningful high school education is achieved (dissenting op at 948-954). As the dissent itself exemplifies by "of course" rejecting the eighth (or ninth) grade test of the Appellate Division and offering no other, a constitutional standard of sound basic education need not pinpoint a date with statutory precision, so long as it defines the contours of the requirement, against which the facts of a case may then be measured.[11] Indeed, a sound basic education back in 1894, when the Education Article was added, may well have consisted of an eighth or ninth grade education, which we unanimously reject. The definition of a sound basic education must serve the future as well as the case now before us.
Finally, the remedy is hardly extraordinary or unprecedented (dissenting op at 958). It is, rather, an effort to learn from our national experience and fashion an outcome that will address the constitutional violation instead of inviting decades of litigation. A case in point is the experience of our neighbor, the *932 New Jersey Supreme Court, which in its landmark education decision 30 years ago simply specified the constitutional deficiencies, beginning more than a dozen trips to the court (dissenting op at 958 n 11), a process that led over time to more focused directives by that court (compare Robinson v Cahill, 63 NJ 196, 198, 306 A2d 65, 66 [1973] with Abbott v Burke, 119 NJ 287, 385-391, 575 A2d 359, 408-411 [1990]). In other jurisdictions, the process has generated considerably less litigation, possibly because courts there initially offered more detailed remedial directions, as we do (see e.g. Rose v Council for Better Educ., Inc., 790 SW2d 186, 215-216 [Ky 1989]). We do not share the dissent's belief that in New York any constitutional ruling adverse to the present scheme will inevitably be met with the kind of sustained legislative resistance that may have occurred elsewhere.
Nor is it certain that plaintiffs' success will necessarily inspire a host of imitators throughout the state (dissenting op at 956). Plaintiffs have prevailed here owing to a unique combination of circumstances: New York City schools have the most student need in the state and the highest local costs yet receive some of the lowest per-student funding and have some of the worst results. Plaintiffs in other districts who cannot demonstrate a similar combination may find tougher going in the courts.
We trust that fixing a few signposts in the road yet to be traveled by the parties will shorten the already arduous journey and help to achieve the hoped-for remedy.
Accordingly, the order of the Appellate Division should be modified and the case remitted to Supreme Court for further proceedings in accordance with this opinion, and as so modified affirmed, with costs to plaintiffs.
SMITH, J. (concurring).
I concur in and join the decision of the Chief Judge and the decision to modify the order of the Appellate Division. I write separately in order to focus on several aspects of this litigation. I conclude that (a) the Regents Learning Standards provide students with the minimum skills required by a sound basic education, (b) the remedy should be statewide in scope and (c) the remedy should include the reformulation of the present formula for allocating state funds. All the children of New York are constitutionally entitled to the opportunity of a high school educationup to the 12th gradethat imparts the skills necessary to sustain competitive *933 employment within the market of high school graduates, acquire higher education, and serve capably on a jury and vote.

The Importance of a Sound Basic Education[1]
It is commonly said that education is the State's most important responsibility. Education is just one of the many responsibilities of the State. Only a few of the responsibilities involving the provision of certain services are actually mentioned in the State Constitution. These include the incarceration of criminals,[2] helping the needy,[3] and providing housing for the poor and the elderly.[4] Of the three, only the section dealing with helping the needy contains the mandatory "shall," although it then gives the Legislature the discretion to determine "from time to time" how the help to those it classifies as needy is to be provided. There is no discretion, however, in the statement, "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated" (art XI, § 1). The only discretion is in the hands of parents who do not have to send their children to public schools. Since education is the most important responsibility of the State, it follows, a priori, that building schools that provide children with a sound education is more important than building jails to incarcerate criminals, shelters to house the homeless, and low income housing for the poor. This order of priorities recognizes that a child who has an opportunity for a sound education is less likely to become a criminal or be homeless.

*934 Sound Basic Education Equals A High School Education
Throughout this litigation, the State has ferociously clung to the argument that a sound basic education consists of the ability to read, write, and do math at a rudimentary level.[5] Since these skills are generally acquired by the eighth or ninth grade, the State then argues that this is the constitutional minimum.[6] The view of the State is essentially that of the concurring opinion of Judge Levine in Campaign for Fiscal Equity v State of New York (86 NY2d 307, 324 [1995] [CFE I]), who concluded that "what legitimately might be called an education are the basic literacy (reading and writing) and computational skills and, in a public educational system, citizenship awareness. A public educational system failing to provide the opportunity to acquire those basic skills would not be worthy of that appellation" (id. at 331). Judge Levine disagreed with the holding of the majority that a sound "education should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (id. at 316). The majority in CFE I also stated that this definition did not "definitively specify what the constitutional concept and mandate of a sound basic education entails," which would take place "after discovery and the development of a factual record" (id. at 317). At this point, the discovery has taken place, and the factual record has been developed.
The record establishes what would strike many as an obvious truth: a high school education is today as indispensable as a primary education was in 1894.[7] Children in the 21st century need the opportunity for more than a ninth grade education to *935 be productive citizens. Back in the 19th century, a high school education was not needed to obtain a good job. Now, a high school education is a prerequisite to most good jobs.[8] Those who lack a high school education and have obtained good jobs have done so in spite of, not because of, the lack of a high school education. While it may be true that there will always be menial low-skills jobs, and thus a need for people to fill them, it should not be the purpose of the public schools to prepare students for those jobs, which are limited in number and dwindling.
It is worth noting that although a secondary education was *936 not as prevalent at the time the Education Article was adopted as it is today, free public education included a high school education. It was in 1853, almost 40 years before the adoption of the Education Article, that the Legislature began allowing districts to form union districts, which could establish a high school. Thus, the public school system that the Education Article constitutionalized included a system that provided a free high school education.
A sound education also connotes the necessary preparation to acquire higher education. In connection with the second section of the Education Article, which constitutionalized the Regents, the Constitutional Convention committee on education stated that "[h]igher education here, as in every other civilized country, has been the chief factor in developing the elementary and secondary schools" (2 Documents of 1894 NY Constitutional Convention No. 62, at 6). Primary and secondary schools and colleges were thus perceived as interdependent, in the same way that they are perceived today. At the time, the common schools primarily prepared students for high school, and only a few went on to college.[9] Now that a high school education has taken the place of a primary education, it should prepare students for higher education.
Thus, the Education Article requires the opportunity for a sound high school education that should prepare students for higher education, or to compete in the employment market of high school graduates.[10]
*937 The Legislature has prescribed that the Regents "shall exercise legislative functions concerning the educational system of the state, determine its educational policies, and, except, as to the judicial functions of the commissioner of education, establish rules for carrying into effect the laws and policies of the state, relating to education" (Education Law § 207). The 16 members of the Regents are elected by concurrent resolutions of both houses of the Legislature, and they in turn appoint the Commissioner of Education who is the head of the State Education Department (SED) (NY Const, art XI, § 2; Education Law §§ 202, 101). The SED carries out the policies enacted by the Regents, and is responsible for the general management and supervision of all of the public schools in the state (Education Law § 101).
Pursuant to their delegated authority, the Regents establish the requirements students must satisfy in order to obtain a high school diploma. In the past, students could obtain a local high school diploma by passing the Regents Competency Tests (RCTs). Plaintiffs offered unchallenged testimony that the RCTs measured eighth grade reading skills and sixth grade math skills. Students who wished to obtain a Regents diploma were required to pass more rigorous tests. That system is being phased out, and a new system is being phased in. Under the new system, students are required to pass five State-administered Regents examinations in four subject areas (English, mathematics, social studies and science) that are aligned with new Learning Standards. Students can obtain a Regents diploma evincing higher levels of achievement in mathematics, science, and foreign language by successfully completing eight Regents examinations.
The State argues that the Learning Standards are aspirational and "world-class." That the minimum requirements in order to obtain a high school diploma are aspirational, which connotes striving for something that is not necessarily achievable, may actually come as a surprise to high school students who must satisfy them. If these tests are aspirational, then the tests for an advanced high school diploma must be ultra aspirational. While some witnesses described the Learning Standards as "high" and "rigorous," all the witnesses testified *938 that they represent the minimum students need in order to be productive citizens.[11] It is clear that in comparison to the RCTs, *939 the Learning Standards are indeed rigorous.[12] In addition, they are rigorous to the extent the Regents and the SED have determined that being a productive citizen requires learning the skills the Learning Standards impart. The record clearly supports the view that the Learning Standards satisfy the minimum required by the Education Article. In any event, even if the Learning Standards offered more than the minimum required by the Education Article, the State has a constitutional responsibility to ensure that students have the opportunity to meet those standards, since they are a prerequisite to a high school diploma (see 8 NYCRR 3.35, 100.1 [g], [t]; 100.2 [e]; 100.5).
The record establishes that the RCTs did not meet the constitutional minimum because at the high school level, they prepared students to read at an eighth grade level or perform sixth grade mathematics. As a result, students who obtained a local diploma were not assured that they received a high school education. They might have graduated from high school, but the education offered was effectively primary.[13] It is not surprising then, that, as found by the Mayor's Advisory Task Force on the City University of New York, a majority of CUNY freshmen, about half of whom were graduates of New York City *940 high schools, required remedial courses (The City University of New York: An Institution Adrift, at 21-22 [June 7, 1999]).[14]
It is this Court's constitutional responsibility to review the educational standards established by the Regents and determine whether they meet the constitutional minimum. A finding that the Learning Standards meet the constitutional minimum does not somehow constitute an abdication of this Court's responsibility to interpret the Education Article. On the contrary, it would be the failure to review the educational policies of the State to determine if they satisfy the requirement of the Education Article that would constitute a dereliction of this Court's duty to say what the law is. To conclude that courts should not question what the Legislature, through the Regents, determines is a sound basic education is to conclude that this Court should play no role in interpreting the Education Article. It is the responsibility of the State to offer the opportunity of a sound basic education, and it is the responsibility of this Court to determine whether the State is fulfilling its responsibility to the plaintiffs.

The Formulas Do Not Equal A Sound Basic Education
New York's public education system is supported and maintained by funds from three sources: localities (about 56%), the State (about 40%), and the federal government (about four percent). The Legislature has given most boards of education the authority to raise local funds by imposing taxes on residential and commercial properties within each district. In addition, the boards have no constitutional tax limits. The so-called Big 5 cities (Buffalo, New York City, Rochester, Syracuse, and Yonkers), on the other hand, have constitutional tax limits that apply to the total municipal budget. In addition, the *941 boards of education of the Big 5 lack the authority to levy taxes, making them fiscally dependent. Rather, their appropriations are part of the overall budget, which is funded through city-wide taxes, including property taxes, sales taxes, and income taxes. As stated by Dr. Robert Berne, Vice-President for Academic Development and professor of public administration at New York University, this means that "within the confines of the City budget process, education competes directly for other municipal services as opposed to being separate in an independent school district." According to the SED, the "fiscal dependence on these school districts is fraught with problems related to level and stability of funding and the effective use of education dollars." One obvious problem for districts in the Big 5 is that during a fiscal crisis, local appropriations for schools may fall dramatically, affecting their ability to provide the opportunity for a sound education. The same is not necessarily the case in fiscally independent districts since property values tend to be stable, and in fact, may rise during difficult economic times. In the words of Dr. Berne, "Compared to the resources say in New York City where it is a combination of all of the general resources, the property tax is less, economically less sensitive and more predictable tax." Another problem is that in addition to having limits in the amount that they can borrow, there are also State-imposed limits in the amount of taxes cities may levy.[15]
The State uses a system comprised of about 54 formulas to distribute about $13 billion of state aid. Historically, New York City has received close to 34% of the total of state aid. For 1999, New York City's Board of Education had a budget of $9.8 billion. The average per-pupil expenditure for that year was $8,957. The roughly 1.1 million public school students in New York City make up 37% of the total state student population. About 73% of New York City students qualify for the federal government's free or reduced price lunch program that is targeted to poor students. About 72% are African-American or Hispanic. About 80% of all state students with limited English *942 proficiency attend New York City public schools. A substantial number of New York City students are said to be at risk of doing poorly in school because of socioeconomic disadvantages, including poverty, race and limited English proficiency. The record establishes that these students need more help than others in order to meet educational goals, such as extended school programs, remedial instruction, and support services.
The most important category of formulas is termed basic operating aid, which distributes $5 to $6 billion of state aid based on weighted attendance and wealth of school districts. Although we held in Board of Educ., Levittown Union Free School Dist. v Nyquist (57 NY2d 27 [1982]) that the Education Article does not require equality of educational resources, operating aid seeks to have a wealth equalizing effect by giving more to low-value property districts and less to high-value property districts. Operating aid also distributes flat grants to each district regardless of the level of wealth.
New York City receives about 36% of operating aid. Mr. Kadamus testified that operating aid treats New York City as an average wealth district, overlooking the high concentration of poverty. Thus, it is "impossible for that particular aid formula to drive a lot of additional money into New York City, so, therefore, you have to use other parts of the formulas to do that and so far those parts of the formulas have not been particularly well-funded compared to the operating aid formula."
The State did make an attempt to ensure that high-need districts have adequate resources by adopting an Extraordinary Needs Aid (ENA) formula in 1993. About 93% of New York City students fall within the ENA formula. Thus, New York City received most of the funding allocated to ENA. Despite this, however, New York City's total state aid allocation hardly changed after ENA was phased in, largely because ENA only accounts for about five percent of the total state aid. Mr. Kadamus testified that ENA fails to provide districts with high-need students with the needed funds.[16] The former Director of the State Division of the Budget, Robert L. King, testified that the central budget office had not determined whether the amount allocated under ENA provided schools with the necessary funds to educate at-risk children. In the same vein, the Division has not sought to determine whether school districts have sufficient *943 resources to provide students with an adequate education.
Year after year the formulas have consistently failed to measure the actual costs necessary to provide New York City students with a sound education. Rather, New York City's share of state aid has been close to 34% regardless of the City's actual education needs. The record supports Dr. Berne's opinion that "it is well known that the share of New York City's increase in aid is determined first in the legislative process and then the formulas are actually driven backwards to get that share to come out."[17]

The Paper Trail
The ineffectiveness of the formulas has been documented by the Regents. While the Regents are responsible for establishing educational policy in the State, they have no equivalent power with respect to funding. That power is in the hands of the Governor and the Legislature. However, the Regents, along with the Commissioner of Education, suggest to the Legislature the amount of spending they believe is necessary to meet the educational goals they have established. Each year, the Regents and the SED submit to the Governor and the Legislature an annual report containing a great deal of information about the state of the education system, which is designed to ensure greater correlation between student outcomes and expenditures (Education Law § 215-a). In addition, the Regents and the SED regularly appoint formal committees and task forces to study educational issues. Virtually every document in the record prepared by the Regents or the SED dealing with funding has been critical of the formulas. For example, the Regents' Proposals on School Aid for 1993-1994 and 1994-1995 state that the formulas:

*944 " do not provide adequately for all students, especially the most needy
" are unduly complicated, with 53 separate formulas governing the distribution of aid
" inhibit local flexibility, since many kinds of aid require specific programs whether or not such programs are the best use of the money
" entail no accountability for results, because districts continue to receive the money no matter what
" do not deal adequately with local differences in wealth and cost
" do not adequately support needed improvements in teaching and learning * * *
" lack public credibility, for all of these reasons."
The preface to the 1999 annual report prepared by the Regents and the SED finds that:
"[W]ith few exceptions, the formulas do not consider the extra help in achieving the standards needed by children placed at risk by poverty and limited proficiency in English. Thus, because New York City's property and income wealth per pupil is close to the State average, its State aid allocation per pupil is also close to the State average. The fact that the City's percentage of students eligible for free lunches exceeds the State average by 28 percentage points (73 compared with 45 percent) does not substantially increase their State aid allocation."
A 1999 Discussion Paper prepared by the SED for the Regents Subcommittee on State Aid (Moving Towards Adequacy, Recognizing High Cost Factors In the Financing of Public Education) concluded the formulas did not take into account regional cost differences in professional service costs and the number of high need pupils. The Paper made several proposals, which it noted,
"recognize and correct the fundamental unfairness of allocating $3,000 in State Aid per pupil to districts which are identical in fiscal capacity. One *945 district is located in a high cost area of the State where this $3,000 has a purchasing power of only $2,250 and 80 percent of the student body live in households that fall below poverty. The second district is in a low cost area of the State where the purchasing power equivalent of this $3,000 is $3,500 per pupil and only 10 percent of its student body is poor." (At 8.)
The Paper also reaffirmed the conclusion of substantial prior research that "as the concentration of children in poverty increased at the school building level, achievement decreased. These negative achievement effects were not trivial but dramatic." (At 5.) As to the relationship between funding and student need, the Paper found that 93% of New York City students fell within the ENA formula, and that this percentage:
"was almost three times greater than the comparison percentage of other districts similar to New York City in their wealth. Since State Aid is highly equalizing with respect to wealth, but less well equalized with respect to the concentration of disadvantaged pupils, the unusually high concentration of disadvantaged pupils places it at a funding disadvantage." (Id.)
Although the distribution of $10.4 billion in state aid "was found to be highly wealth equalized" when it was "recalculated on a poverty-weighted pupil basis, the desired equalization of the current aid distribution diminished significantly." (Id.; emphasis omitted.)
The same observation was made in the foreword to the Regents' Proposal on State Aid to School Districts for the School Year 2000-2001. According to its foreword:
"At a time when the Regents have imposed higher standards for graduation throughout the State's public schools, it is important that State aid to school districts must be better targeted on those districts with the highest costs and the farthest to go to meet the standards. * * *
"Throughout history, State Aid to education has not been distributed in a manner that both recognized student need and provided incentives for academic improvement. In addition, schools and *946 districts were not held accountable for the results of education spending. Rather, State Aid has been distributed based primarily on the wealth of a district as measured by its real estate assessments and income of residents (the lower the value of its combined wealth, the more the aid) and its student attendance. Accordingly, State Aid has been distributed on a district's theoretical capacity to pay for education, with limited regard to educating its students to desired levels.
"The New York City School District has been affected by this process with its near-average wealth and high student need. The result is that the district has never enjoyed State Aid increases that reflect the costs of educating all students to levels accepted in the rest of the State. Student results have shown that many schools have great difficulty in meeting student needs. The State and the nation must face the exorbitant costs for public assistance, criminal justice and lost productivity that such education failure requires."
The then-current Chancellor of the Regents, Dr. Hayden, was asked, "Do you believe that you have a thorough understanding of the state aid formula system?" He replied, "I do not." When asked why not, he said, "I think it defies scrutiny * * * [Q]uite frankly, I think there are very few people in the State of New York who understand the state aid formula and how it works * * * I believe the public is at an extreme disadvantage when it cannot follow the way in which the money moves." The same sentiment was expressed by Dr. Sobol. He testified that the complexity of the formulas "made it more difficult to direct the aid where we thought it was most needed, namely, with those students who were not now enjoying the benefits of the resources needed to require the sound basic education." Under his helm, the SED was concerned with disparities in wealth and cost across the State "not only because of the inequality, but because of the inadequacy, because, in some situations, it makes it impossible for local schools or school districts to provide the conditions that students need if they were to obtain the sound, basic education under the constitution." New York City was one of these school districts.
The current Commissioner, Dr. Mills, testified that he did not have a deep understanding of how the formulas work, and *947 that only "very few people" do. Dr. Berne, who is one of those few people, testified that the formulas are extremely complex, making it "hard for most people in the State to understand and * * * easier for manipulation." The shares agreement "negates the general factors that are shown in the formulas * * * that are supposedly driving resources to children in school districts." The complexity of the formulas and the decision to predetermine the amount New York City students need are the culprit for the lack of "alignment between educational goals and the components of the school finance system." Defendant Governor Pataki has called the formulas "incomprehensible," "convoluted," and destined for the "ash heap of history."[18]

Remedies
The formulas have consistently failed to provide New York City schools with the funds necessary to allow them to provide a sound education for their students. Despite constant fine-tuning, the formulas have impeded the duty of the Legislature to maintain and support an effective system of public schools in New York City. In fact, their Byzantine complexity makes it possible for aid to be distributed in an arbitrary manner that bears no relationship between educational goals and costs associated with meeting those needs. Consequently, the formulas are incompatible with the Legislature's duty to provide a sound education to New York City students. Since the formulas are used to distribute aid to all the schools in the state, the remedy must necessarily affect the entire interdependent school system. In place of the formulas, the Legislature should institute a scheme that: (1) eliminates the current state formula for distributing aid to New York City; (2) determines, to the extent possible, the actual costs of the resources needed to provide the opportunity for a sound basic education in all school districts in the state; and (3) ensures that at a minimum every school district has the necessary funds to provide an opportunity for a sound basic education to all of its students.
While the foregoing may not guarantee that the opportunity of a basic education will be available to all the children in the state, they are necessary steps in that direction. In sum, I join the decision of the Chief Judge, but the Constitution requires the State to do even more than is stated to ensure a sound basic education for all students.
*948 READ, J. (dissenting).
This case is not about whether education is important for the vitality of our democracyof course, it is. This case is not about whether the children who attend New York City's public schools require more than an eighth-grade education to meet the demands of today's worldof course, they do. This case is not about whether New York City's public schools have too often failed to furnish our children the learning opportunities that they deserveof course, they have. These are obvious truths, universally acknowledged, which have lately spurred the most significant education reform effort in the history of the New York City public school system. Rather, this case is about whether the perceived shortcomings of New York City's public schools are constitutional infirmities under the Education Article attributable to inadequate state funding. On a more fundamental level, this case is about whether the courts or the Legislature and the Executive should set education policy for our public schools. Because the constitutional standard crafted by the majority to define a "sound basic education" is illusory, because the causal connection between the level of state aid and any deficiencies in New York City's public schools is not proven, and because the majority's proposed remedy exceeds the prudential bounds of the judicial function, I respectfully dissent.

Sound Basic Education
The New York Constitution does not mandate an educational system of a certain quality in express terms. The relevant constitutional text simply reads: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated" (NY Const, art XI, § 1).[1] The words "sound basic education," which have become the catchphrase for an inferred constitutional *949 guarantee of an education of a certain quality, first appeared in our decision in Board of Educ., Levittown Union Free School Dist. v Nyquist (57 NY2d 27, 48 [1982] [Levittown]).
The plaintiffs and intervenors in Levittown sought a declaration that the State's school financing system, then as now comprised of local taxation and state aid, violated the Equal Protection Clauses of the State and US Constitutions and the State Constitution's Education Article because of the funding disparities between wealthier and poorer school districts. We rejected the equal protection claims on the ground that the State had demonstrated a rational basis for its school financing system: "the preservation and promotion of local control of education" (id. at 44).
We further observed that the Education Article focuses on a "State-wide system assuring minimal acceptable facilities and services," not a system assuring equal educational facilities and services throughout the State (id. at 47). We recognized that the State undeniably had in place a system of free schools and a statutory framework requiring minimum days of school attendance, specific courses, textbooks and qualifications for teaching and nonteaching staff. Accordingly,
"[i]f what is made available by this system (which is what is to be maintained and supported) may properly be said to constitute an education, the constitutional mandate is satisfied.
"Interpreting the term education, as we do, to connote a sound basic education, we have no difficulty in determining that the constitutional requirement is being met in this State, in which it is said without contradiction that the average per pupil expenditure exceeds that in all other States but two" (id. at 48 [emphasis added]).
We were careful to register our reluctance to interfere with the Legislature's funding allocations among competing imperatives by mandating an even higher priority for education funding "in the absence, possibly, of gross and glaring inadequacy" (id.).
The suggestion in Levittown of a possibly justiciable claim became a reality in Campaign for Fiscal Equity v State of New York (86 NY2d 307 [1995] [CFE I]). Because the case came to us in the procedural posture of a motion to dismiss, all the complaint's averments were deemed true (see CFE I, 86 NY2d at 318). We did not, however, measure the allegations of gross and glaring inadequacy against the constitutional standard to *950 determine if the complaint stated a cause of action under the Education Article. In fact, we refused to "attempt to definitively specify what the constitutional concept and mandate of a sound basic education entails" (id. at 317). Instead, we crafted a "template" ("the basic literacy, calculating and verbal skills necessary to enable [children] to function as civic participants capable of voting and serving as jurors") for the trial court to utilize to establish the meaning of a "sound basic education" after discovery and trial (id. at 317-318).
Thus was a constitutional standard transformed into the end product of a trial at which experts aired differing views[2] of what is required for minimal educational proficiency and employment success in a competitive urban society. The trial court would be left with policy choices to make, not factual contentions to resolve. The trial court would have to fashion "the constitutional concept and mandate of [what] a sound basic education entails" on the testimony of competing experts (id. at 317).[3]
The risks inherent in this novel approach to constitutional adjudication have now been realized.[4] The trial court modified the "template" to reflect a "dynamic" understanding of the *951 constitutional imperative that must "evolve" with the changing demands of a modern world (187 Misc 2d 1, 16 [2001]). A sound basic education was expanded to require an "engaged, capable voter" who has the "intellectual tools to evaluate complex issues, such as campaign finance reform, tax policy, and global warming" (id. at 14). Furthermore, the trial court understood our "template" to encompass the opportunity to obtain "productive employment or pursue higher education" (id. at 15). The template was transmuted from a constitutional minimum into "the aspirational, largely subjective standards expressed by the lower courts and the dissent in Levittown, representing what typically one would desire as the outcome of an entire public education processto produce useful, functioning citizens in a modern society" (CFE I, 86 NY2d at 329 [Levine, J., concurring]).
Today the majority defines a "sound basic education" as "a meaningful high school education, one which prepares [young people] to function productively as civic participants" (majority op at 908). While unimpeachable, what exactly does this supposed refinement of a "sound basic education" mean? Does a "meaningful high school education" entail a high school diploma, requiring completion of the 12th grade? Evidently not, because the majority notes that "a sound basic education should not be pegged to the eighth or ninth grade, or indeed to any particular grade level" (majority op at 906).
This begs the question of how the courts (or the other branches) are expected to figure out whether the majority's constitutional minimum (i.e., a "sound basic education" defined as a "meaningful high school education" that prepares students "to function productively as civic participants") has been met if completion of the 12th grade and graduation are irrelevant. Similarly, the majority observes that a "high school level education is now all but indispensable" for employment (majority op at 906), without suggesting how a job applicant establishes that level of competence absent a diploma. Further, if the majority means to imply that some quantum of high school education short of graduation comprises a "meaningful high school education," how is this measured other than by relating it to completion of some grade level lower than the 12th?
The requirements for a high school diploma are defined by the State Education Department (8 NYCRR 100.5 [2003]). Students who entered ninth grade in 2001-2002 and those thereafter (except students with disabilities) will only be eligible for a high school diploma upon satisfactorily meeting *952 Regents Learning Standards (RLSs) (8 NYCRR 100.5 [a] [3] [2003]). Thus, if a "meaningful high school education" does, in fact, mean a high school diploma, the majority's standard "cede[s] to a state agency the power to define a constitutional right" (majority op at 907)a result it emphatically rejects.
Although the majority resists adopting the Regents Learning Standards to define a "sound basic education" or a "meaningful high school education," the Board of Regents is, in fact, the constitutionally designated education policymaking body in our state. "The adoption of regulations with respect to graduation requirements, including basic competency examinations, to establish a standard that would make a high school diploma in this State a meaningful credential of the graduate, is clearly within the authority and power of [the Board of Regents and Commissioner of Education]" (Matter of Board of Educ. of Northport-E. Northport Union Free School Dist. v Ambach, 90 AD2d 227, 231-232 [3d Dept 1982], affd 60 NY2d 758 [1983]).
Further, the majority offers no objective reference point as an alternative to the Regents Learning Standards. In order to determine whether "inputs" are sufficient to avoid a constitutional violation, the majority must look to "outputs" correlated to an objective reference point.[5] All traditional education ends in assessment: an examination result, grade advancement, or graduation. In short, the majority has articulated a constitutional standard without any way to measure whether it has been (or may be) met.
The "outputs" section of the majority opinion underscores the problematic nature of the constitutional standard of its devising. First, my colleagues "presume[] that a dropout has not received a sound basic education" and rely on evidence to support this presumption (majority op at 914). They then observe that between a quarter and half of all dropouts leave after completing four years of high school (majority op at 915 n 7). If dropouts by definition do not receive a "meaningful high school education," then it logically follows that the recipient of a high *953 school diploma is the only student who does. Students either graduate from high school or drop outthere is no middle ground where a "meaningful high school education" makes any sense.
Next, the majority criticizes the probative value of test results offered by the State on "an assortment of commercially-available nationally-normed reading and math tests administered to children in City elementary schools" because the results were referenced to a norm rather than to achievement levels (majority op at 918). Even though New York City's elementary school students rank in the middle nationally in terms of the reading and mathematical skills of their peers, the majority views these tests results as irrelevant because "[t]he State has not shown how to translate these results into proof that the schools are delivering a sound basic education, properly defined" (majority op at 918 [emphasis added]). I fail to grasp why scores reflecting a proficiency for New York City students which is equal to, or better than, that of half of their peers nationally still falls short of a constitutional minimum.
Lastly, the majority discounts the Regents Competency Tests (RCTs), the state prerequisite for a "local" high school diploma, because the RCTs assess "an eighth or ninth grade level in reading and a sixth-to-eighth grade level in math" and thus do "not prove that [students] have received a meaningful high school education" (majority op at 917). But students who receive a local diploma have successfully completed the twelfth grade. They simply have not taken Regents exams in their courses.
The indispensable nature of the "outputs" in determining whether the New York City public school system currently or prospectively provides the opportunity for a "meaningful high school education" cannot be overstated. Here, the majority definitively specifies only what the acceptable educational "output" is not. It is definitely not the RCTs, which are being phased out in favor of the RLSs, because they are insufficiently ambitious to comport with modern-day understandings of what a sound basic education encompasses (and, if measured by the RCTs, the New York City public school system does not violate the quality standard of the Education Article). But the majority also balks at adopting the RLSs, which represent too ambitious a minimum at present for the ever-evolving constitutional principle at stake. In any event, the RLSs are not a proper constitutional standard because they may bend, grow or retreat at the will of a state agency.
*954 The majority's dilemma is easy to appreciate. Recognizing the Judiciary's limitations as an education policymaker, my colleagues are reluctant to create a detailed quality standard by which to define the State's obligation under the Education Article. But they are also unwilling to cede to the Board of Regents and the State Education Department the power to define (and, in the future, redefine) what is claimed to be a constitutional principle (albeit a dynamic one), not an education policy decision. As a result, the standard that the majority has createda "meaningful high school education" that prepares students "to function productively as civic participants"is illusory. It surely is no more definite than the template enunciated for a "sound basic education" in CFE I, unless, of course, the majority, in fact, intends to equate a "meaningful high school education" with a high school diploma. In that event, my colleagues have, as a practical matter, adopted the RLSs and the Regents diploma as defining the constitutional minimumfor the present.[6]

Causation
In Levittown, we had "no difficulty in determining that the constitutional requirement [was] being met" by virtue of the State's substantial financial contribution to education alone, which placed New York third among the states in per-pupil expenditures (see Levittown, 57 NY2d at 48).[7] New York still spends more on state aid for education than all but two states in the nation, although New York has lost its rank as the second most populous state in the 20 years since Levittown.
In 2002-2003, the Legislature disbursed $12.3 billion from the General Fund for public education statewide. This represented almost 31% of all General Fund disbursements for the *955 fiscal year. Moreover, the State's contribution to the New York City school system has markedly increased over the past several years, from $3.1 billion in fiscal year 1993-1994 to $4.5 billion in fiscal year 1999-2000 to more than $5 billion in fiscal year 2002-2003. As the State's contributions have increased, the City has not kept pace. As a result, from fiscal year 1994-1995 to fiscal year 1999-2000, the State's share of the City's combined state and local education funding increased from 47% to 51% (approximately 10% of the City's education budget consists of federal funds). Concomitantly, the City's share decreased from 53% in 1995-1996 to 49% in 1999-2000.
In 1999-2000, the school year during which the trial in this case ended, the Board of Education received more than $10.4 billion from all sources to operate New York City's public schools, amounting to $9,500 per pupil. Between 1997, when the Board's budget was $8.1 billion, and 2000, pupil spending increased by 20% even after adjusting for inflation. The City reports its current school year overall budget to have risen to $12.4 billion, or $11,300 per enrolled student. In addition to its operating budget, the Board's capital plan at the time of trial provided over $7 billion in funding for new school facilities and repairs to existing facilities.
In short, very substantial sums are spent on New York City's public schools. If it were counted as a state, New York City would rank fifth in per-pupil expenditures; it would rank ninth if spending were adjusted for cost-of-living differences. Again, the State contributes about half of these very substantial sums.
The plaintiffs originally complained that New York City's public schools were necessarily underfunded by the State because they enrolled 37% of the State's public school population but received slightly less than 35% of the total state aid distributed. Addressing this point in CFE I, Judge Simons in his dissent pointed out that "[t]here is no constitutional requirement * * * that the State maintain exact parity in the financial aid distributed to the several thousand school districts" (CFE I, 86 NY2d at 340). In any event, for the 2002-2003 school year, the City enrolled 37% of the State's public school population and was allocated 37% of the combined major aid enacted (see New York State Division of the Budget, Education Unit, Description of 2002-03 New York State School Aid Programs, at 35, table II-E).
In this lawsuit, plaintiffs assert that the Education Article establishes a particular quality standard, and that New York *956 City's public schools do not offer students the opportunity for an education that meets this quality standard. Plaintiffs then argue that the reason for this failure is necessarily inadequate state funding, even though the New York City public school system receives substantial school aid and has benefitted from huge increases in school aid over the life of this litigation. Plaintiffs' proof of a causal link amounts to nothing more than an article of faith: the New York City public school system is not what we would like it to be or what it needs to be, and more money is always better; therefore, the system's shortcomings are attributable to inadequate funding, for which the State is necessarily responsible because of the obligation placed upon it by the Education Article. As the Appellate Division recognized, this is not proof of a causal connection, it is a recipe for "limitless litigation" (295 AD2d 1, 9 [2002]). Moreover, I would not expect this "limitless litigation" to be confined to litigants concerned about New York City's public schools. The success of plaintiffs' theory here will no doubt inspire a host of future litigants representing other communities and school districts throughout the State.[8]
In fact, of course, educational deficiencies are not always attributable to the lack of money or necessarily cured by the infusion of more funds.[9] A wide variety of nonfinancial factors (not to mention socioeconomic factors) may contribute to academic failure, including mismanagement, excessive administration, misassigned teachers, misplaced spending priorities, outright corruption, and an improper emphasis on some programs.
For example, the majority points to excessive class size as a measurably deficient "input." Certainly, the Board of Education might hire more teachers if increased funds were made available for this purpose. Class size, however, is also a function *957 of how the Board deploys its teachers. Before their recently negotiated collective bargaining agreement, the City's teachers had a shorter contractual teaching day than was the case in any other school district in the state or in other large urban districts across the nation. New York City has one teacher for every 14.1 students, placing it in the top 10% of large districts across the nation. By comparison, Los Angeles, the second largest school system in the nation, has one teacher for every 20.8 students.
Further, the Board of Education employs thousands of teachers who are not assigned classroom teaching duties.[10] Thus, although the City employs roughly the same number of teachers per student as the rest of the state, its class sizes are much larger.
Nor does additional funding for more teachers or increased teacher pay neatly translate into the assignment of more qualified teaching staff to the "worst" schools. For example, the record clearly established that the most inexperienced teachers are routinely placed in the "worst" schools. This situation is likely to persist, regardless of the number of teachers or their pay, so long as the collective bargaining agreement between the teachers' union and the school district allows more experienced teachers to opt out to "better" schools.

Remedy
The majority first directs the State to determine the actual cost of a "sound basic education" and to ensure that every school in New York City has the necessary funding to meet the standard, and sets a deadline. The funding level must reflect the cost of a "sound basic education" that is not tied to anything other than a "meaningful high school education." The majority also remands the case to the trial court to review the Legislature's efforts to determine if under the new funding scheme "inputs and outputs improve to a constitutionally acceptable level" (majority op at 930).
*958 This remedy is extraordinary, if not unprecedented. Having determined that the State is not satisfying its constitutional obligation with respect to the education of New York City's public schoolchildren, we shouldas the State requests simply specify the constitutional deficiencies. It is up to the Legislature, as the entity charged with primary responsibility under the Education Article for maintaining the State's system of public education, and the Executive, who shares responsibility with the Legislature, to implement a remedy. This lawsuit should be at an end. Instead, the majority, observing that "the political process allocates to City schools a share of state aid that does not bear a perceptible relation to the needs of City students" (majority op at 930), casts the courts in the role of judicial overseer of the Legislature. This disregards the prudential bounds of the judicial function, if not the separation of powers.
Moreover, as soon as the trial court is called upon to evaluate the cost and effectiveness of whatever new programs are devised and funded to meet the needs of New York City's schoolchildren, the education policy debate will begin anew in another long trial followed by lengthy appeals. The success of the new funding mechanism will then be tested by outputs (proficiency levels). This dispute, like its counterparts elsewhere, is destined to last for decades,[11] and, as previously noted, is virtually guaranteed to spawn similar lawsuits throughout the state.
Our remedy also signals the demise of local control, a key component to the constitutionalization of New York's public school system. Long before the Education Article's adoption in 1894, New Yorkers were free to require their local schools to *959 provide more than a minimal education. As Levittown instructs, this may be done without offending the Constitution. Nonetheless, by constitutionalizing what we would like our children to learn and making the State solely responsible for ensuring that this standard is met, we have severely undercut local control. We have centralized responsibility for educational competence (not constitutional compliance) in the courts and their anticipated "dialogue" with the Legislature.

Conclusion
Trial judges and appellate courts are well suited to assess criminal responsibility in accordance with prescribed procedures; to assign liability for breaches of duty; to extrapolate legislative intent; or to interpret commercial agreements. Each dispute is based on fact and law. They are not, however, well suited to make the subtle judgments inherent in education policymaking, or to assess how the State of New York may best allocate its limited resources to meet its citizens' educational and other pressing needs.
Of course, the majority sincerely sees itself as interpreting constitutional commands, a proper and solemn judicial function, not as making policy choices and value judgments constitutionally committed to the other branches of government. In my view, however, by this decision, the majority has allowed its deep sympathy for educational excellence to overwhelm its sense of the proper and practical limits of the judicial function.
Accordingly, I would affirm the decision of the Appellate Division, and dismiss plaintiffs' complaint.
Order modified, etc.
NOTES
[1] After the Appellate Division's decision, the United States Supreme Court decided Gonzaga Univ. v Doe (536 US 273 [2002]). Though not a title VI case, Gonzaga reinforces the conclusion the Appellate Division correctly drew from various federal circuit court decisions: that where a statute does not clearly and unambiguously create an implied private right of action, it also does not create rights enforceable under 42 USC § 1983. Plaintiffs' only argument to distinguish their case from Sandoval was that they brought their disparate impact claim under section 1983, but Gonzaga shows that this distinction is unavailing, as is plaintiffs' further attempt to distinguish Gonzaga.
[2] The composition of the Board of Education and its responsibilities and the Chancellor's have changed substantially since trial (see L 2002, ch 91, §§ 6, 11, 12). We are, of course, bound by the record, which has been subjected to adversarial scrutiny, and do not consider posttrial factual materials.
[3] By contrast, the State argues that by showing that the outputs are good enoughin particular, that City schoolchildren perform satisfactorily on certain standardized testsit has obviated inquiry regarding the inputs. The State reasons that many children come to City schools with socioeconomic and cultural backgrounds that put them at risk of academic failure, as the evidence confirms. Therefore, the State continues, while the City schools cannot necessarily be blamed for bad results, they surely should receive full credit for any good results. Indeed they should. But the outputs here do not support a judgment for the State.

While the State urges an affirmance based on what it considers good outputs, the dissentrelying on Payntersuggests that there is something "inconsistent" about even discussing them (dissenting op at 952 n 5). Paynter holds that proof of inadequate inputs is necessary for an Education Article claim, not that such proof is sufficient for such a claim. Thus, our discussion of outputs is consistent with both Paynter and CFEwhich contemplated cautious use of output evidenceas well as responsive to an argument the State made.
[4] Some facts that the trial court classified as purely "physical" facilities inputs are inseparable from overcrowding and excessive class sizeconditions whose measurable effect on students plaintiffs have shown. One symptom of an overcrowded school system is the encroachment of ordinary classroom activities into what would otherwise be specialized spaces: libraries, laboratories, auditoriums and the like. There was considerable evidence of a shortage of such spaces. Particularly poignant is the fact that 31 New York City high schools serving more than 16,000 students have no science laboratory whatsoever. Whether this fact stems from overcrowding or from the design of some old school buildings, its direct impact on pedagogy is self-evident and it counts against the State in any assessment of the facilities input.
[5] The counterexample the Appellate Division gives of the City's Catholic schools, where students perform relatively well despite larger class sizes (295 AD2d at 11), is inapposite for various reasons, including the greater flexibility Catholic schools have in choosing, disciplining and expelling students.
[6] The dissent characterizes our holding as one under which "dropouts by definition do not receive a `meaningful high school education,'" so that "it logically follows that the recipient of a high school diploma is the only student who does" (dissenting op at 952, 952-953). But a presumption is not the same thing as a definition; it can be rebutted. The State, indeed, suggested that some students may drop out despite having received a sound basic education. But there is no evidence in the record to support the State's suggestion. If, in fact, high school graduation standards are set exceedingly high, and students can generally make a satisfactory entry into the workplace without a diploma, the State will always be free to prove these facts.
[7] The evidence of Board of Education data tracking the high school classes of 1986 through 1996 is compelling that between a quarter and half of those students who drop out do so after completing four years of high school. Such studentsmotivated to take extra time, if necessary, to complete high schoolstill do not achieve this objective.
[8] The State challenged this very conclusion with the testimony of its sociology expert, Dr. David Armorwho performed statistical studies designed to test the effect of increased educational inputs while controlling for socioeconomic differences among students. The State argued that these studies show no correlation between increased funding and increased teacher certification rates and, further, no correlation between increased certification rates and better student scoresbut the trial court found Dr. Armor's testimony "not persuasive" (187 Misc 2d at 71), a finding the Appellate Division did not contradict.
[9] The same cities have constitutional debt limits (see NY Const, art VIII, § 4 et seq.).
[10] In issuing our directive to the State we recognize that it has fiscal governance over the entire State and that in a budgetary matter the Legislature must consider that any action it takes will directly or indirectly affect its other commitments.
[11] In fact the dissent, though it would affirm the Appellate Division order, identifies no holding of that Court that it considers the better rule of law than those we have set forth today.
[1] See the dissent in Paynter v State of New York (100 NY2d 434, 444 [2003] [decided today]).
[2] The first sentence of section 5 of article XVII, states, "The legislature may provide for the maintenance and support of institutions for the detention of persons charged with or convicted of crime and for systems of probation and parole of persons convicted of crime."
[3] Article XVII, § 1, states, "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine."
[4] Article XVIII, § 1, states, "Subject to the provisions of this article, the legislature may provide in such manner, by such means and upon such terms and conditions as it may prescribe for low rent housing and nursing home accommodations for persons of low income as defined by law, or for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas, or for both such purposes, and for recreational and other facilities incidental or appurtenant thereto."
[5] The record supports the conclusion that the State fails to provide a significant number of children even the opportunity to learn these rudimentary skills.
[6] Defendant Governor Pataki has publicly declared: "I totally disagree with the concept that an eighth-grade education is adequate, and it will never be the policy of this state so long as I am the governor of this state" (Shaila K. Dewan, Pataki Attacks June Ruling that 8th-Grade Education is Enough, New York Times, Sept. 13, 2002, at B6, col 1).
[7] Thomas Sobol, who served as Commissioner of Education from 1987 to 1995, testified that a high school diploma is the "lin[g]ua franca of our society educationally." Dr. Levin, educational economist at Columbia University's Teachers College, testified that it is the "conventional wisdom that [high school] dropouts are increasingly disadvantaged in the labor market relative to high school graduates." The reason for this is "that the labor market is changing in terms of the demand for skills that we have moved very heavily towards intellectual work, new forms of production and also new forms of work organization that require much more skill than they have in the past."

Dr. Levin concluded that for every dollar spent to ensure that students graduate from high school, "there's a return of about six to $7 for society as a whole, just in earnings alone, and that the revenues that are generated are about twice that of the costs." As to high school dropouts who obtain a general equivalency diploma (GED), Dr. Levin testified that "the job prospects and lifetime earnings of the GED certificates is [sic] considerably less than that of the high school graduate. In fact, it is equal or close to that of high school dropouts." The military, which originated the idea, no longer considers a GED the equivalent of a high school diploma. In addition, the four-year college graduation rate of GED holders is about two percent.
[8] Dr. Sobol testified that "preparation for the world of work in this case for sustaining competitive employment has very long been a purpose of the public schools of the United States. * * * [T]he skills that students need in today's world to sustain competitive employment vastly outstrip the level of skill and knowledge that was generally requisite even as short a time as a generation or two ago." Children in the 21st century "need to understand complex communications technology and be able to use it effectively. They will have to solve problems on the workforce in a changing scene. They will have to apply their knowledge to increasingly new situations. They are unlikely to learn one craft well and practice it for their entire lives but to move about as we see more and more."

Dr. Linda Darling-Hammond, a professor at Stanford University and Executive Director of the National Commission on Teaching and America's Future, testified that "preparing students for employment has been part of the rationale for public education since the beginning of public education in this country." She also testified that the findings of abundant research in this area are "that students today need much higher levels of technical skills and knowledge than they did in the past; that that set of skills includes the ability to manage and comprehend complex text and information to manage resources. About 90 percent of the jobs that are in the economy today * * * are jobs that require at least a high school education and a level of technical skill in managing technology, text, and various kinds of content specific competencies that we used to expect of only about 50 percent of the employees in 1950."
Even one of defendants' experts, John Murphy, the President of Education Partners, testified, "I would think that a school system has a responsibility to prepare all of its children to compete in this society, yes." He then agreed with the statement that to "compete in society means to get a good, productive job."
[9] In 1894, there were in total 96 universities and colleges with 23,835 students in New York. There were also in total 437 high schools with 45,036 students (3 Lincoln, Constitutional History of New York, at 549-550). At the national level, only 10% of teenagers were enrolled in high school in 1900. Forty years later, the percentage had risen to 70%. The figure now is about 95% (Diane Ravitch, American Traditions of Education, in A Primer on America's Schools, at 13 [2001]). In 1960, about 41% of adults had a high school diploma. By 1998, that figure was 82%. About the same percentage of adults in New York have a high school diploma (Robert Putnam, Bowling Alone: the Collapse and Revival of American Community [2000]). Education Law § 3205 requires children from ages 6 to 16, with certain exceptions, to attend full time instruction. A person under 21 years old who has not received a high school diploma is entitled to attend for free the public school in his or her district (Education Law § 3202 [1]).
[10] It is already the official policy of the Regents that an education should prepare children "to compete successfully in today's demanding global society." It is also worth noting that a 1996 National Education Summit attended by 44 governors and 44 chief executive officers of major national corporations adopted, on behalf of the President of the United States, the policy statement that "[t]he primary purpose of education is to prepare students to flourish in a democratic society and to work successfully in a global economy" (emphasis added).
[11] Dr. Sobol initiated a 13-year quest to determine the skills that a sound basic education should provide. Dr. Sobol spearheaded the creation of seven "curriculum committees, each in key areas of the school curriculum" composed of experts from just about every field. The Learning Standards are the work product of these committees. According to Dr. Sobol, the Learning Standards "operationalize the conditions that would lead to a sound basic education." The Learning Standards were not entirely completed during Dr. Sobol's tenure, and the work was continued by his successor, Dr. Richard Mills. According to Commissioner Mills, the Learning Standards seek to ensure that

"all students in New York are prepared to be citizens, to, in other words, be able to vote and know what they are voting on and carry the other burdens of the citizenship, serve on juries and do all the other things that citizens must do; to prepare them for work, have a choice for work, to be competent in that work, to be able to grow in that work as work changes and to be competent as individuals."
In his memorandum to the Regents explaining the Learning Standards and urging the Regents to adopt them, Commissioner Mills stated: "All children need strong skills and knowledge to grow into competent, caring, productive adults and citizens in a free society. To give any student an undemanding or watered-down education is not a kindness; it's wrong." Commissioner Mills testified that "at-risk" students can satisfy the Learning Standards, but that they require additional resources in order to do so.
The Chancellor of the Regents, Carl T. Hayden, testified that the Learning Standards sought to reverse the education system's "inextricable slide into mediocrity," and that too many children were graduating but could not "demonstrate the rudiments of reading, writing, and computation." He testified that the ultimate purpose of the Learning Standards "is to give our young people the skills and knowledge they need in order to be effective citizens, effective mothers and fathers, effective participants in our great democratic enterprise and people who can compete in an economy that is in the midst of a dramatic transformation." Moreover, he testified that the Learning Standards "are not too high. These standards represent our judgment about what our young people need."
SED Deputy Commissioner for Elementary, Middle, Secondary and Continuing Education, James A. Kadamus, testified that the standards "were based on studies that we had done of what it takes to be successful in the world of work and be successful in higher education, and so it is based on the currentwhat are the current requirements of the work force and higher education." He testified that "[w]e want all students to achieve a certain set of standards without holding back students that could go way beyond that point, so we want both. We want all students to achieve the learning standards, and the students who have the motivation and capability who could go far beyond, we want the incentives to do that." The standards are beyond the competency standards; they go beyond "basic literacy, calculating, and verbal skills." The State relies on the latter statement and others in arguing that the Learning Standards are too high. A sound basic education requires teaching and learning the skills to become a productive citizen. Rudimentary reading, writing and math are not enough. Thus, the Learning Standards are high only to the extent that they require more than being able to perform simple math, and read and write at the most basic level.
[12] The Learning Standards are relatively numerous and lengthy, but to get a general sense of what they require, the first standard for English Language Arts states as follows:

"Language for Information and Understanding * * * Students will read, write, listen, and speak for information and understanding. As listeners and readers, students will collect data, facts and ideas; discover relationships, concepts and generalizations; and use knowledge generated from oral, written, and electronically produced texts. As speakers and writers, they will use oral and written language that follows the accepted conventions of the English language to acquire, interpret, apply, and transmit information."
[13] According to Commissioner Mills:

"[T]he math Regents competency test is only arithmetic; and while some people may think that's enough, you can't get into an apprenticeship program without algebra; you certainly can't do college-level work; you can't understand technology; you can't even deal with the daily newspaper without something more than arithmetic. So it is not minimalit is not minimally acceptable."
[14] The Task Force also found that "[r]ecent decades have seen a restructuring of the City's economy from one based on manufacturing to one driven by services. Finance, insurance, and real estate dominate the marketplace and account for disproportionately high shares of income. Along with medical services, business services, and communications and entertainment, these are the prime sources of good jobs. Advanced technology counts for an increasing share of the City's employment * * * Each of these sectors of job growth is relentlessly competitive, requiring high-level academic skills for success. * * * [W]ith certain exceptions such as tourism, traditional jobs requiring less education are declining. Jobs in manufacturing have been dropping at about the same rate as jobs in services have been increasing. * * * Opportunities for less-educated workers are likely to keep declining, while continued increases in the services sector will bring more good jobs to people with computer skills who are literate, can write, and are well-grounded in science and mathematics." (Id. at 13-17.)
[15] The State attempted to ensure that the City's contribution to education remains stable despite changes in the economy by enacting a law commonly known as the Stavisky-Goodman Law (Education Law § 2576 [5]). According to Dr. Berne, the law has not been effective at ensuring that contributions from the City remain stable because it applies to all funds in the New York City budget received from local taxes, the State and the federal government, and because it is not clear who can invoke it. A recent law enacted in 2002 makes clear that it applies only to the City's own budget (L 2002, ch 91, § 5, adding Education Law § 2576 [5-a]).
[16] This view was reiterated by Harold Levy, former member of the Regents and former Chancellor of the New York City Board of Education.
[17] A 1996 report by the then State Comptroller H. Carl McCall, entitled An Agenda for Equitable and Cost-Effective School Finance Reform, concluded as follows: "The current day complexity and convoluted nature of the aid system is the result of many years of manipulation of the formulas through the budget process. Each year the legislative leadership and the executive agree on some broad parameters for school aid, such as how much the year-to-year increase will be and on how, overall, the aid will be distributed among regions. The formulas and grant programs are then altered by technicians to achieve the desired result. Although the formulas were originally intended to reflect need, each year's manipulation is in truth most heavily driven by a politically determined distribution requirement. The focus is always on a single year's aid distribution rather than on conceptual concerns about need and how aid should be provided. The cumulative result of this annual patchwork is therefore quite naturally a jumble." (At 31.)
[18] See Governor Pataki's press release of January 3, 2001, available at .
[1] New York is one of 15 states whose constitutions' express terms impose an educational obligation to maintain a system of free public schools, but nothing more (see William E. Thro, Note, To Render Them Safe: The Analysis of State Constitutional Provisions In Public School Finance Reform Litigation, 75 Va L Rev 1639, 1661-1670, 1662 n 109 [1989]). By contrast, 19 state constitutions mandate a system of public schools meeting an articulated standard of quality such as "thorough and efficient"; eight state constitutions contain a stronger and more specific educational mandate and purposive preambles; and seven state constitutions impose the greatest obligation on the state legislature by providing that education is "fundamental," "primary" or "paramount" (see id.; see also William E. Thro, School Finance Reform, A New Approach to State Constitutional Analysis in School Finance Litigation, 14 J L & Pol 525 [Summer 1998]).
[2] The parties identified and deposed 30 expert witnesses prior to the trial, which featured 72 witnesses and consumed 111 court days over a seven-month period.
[3] In assessing the role of expert testimony at the trial in this case, one commentator has remarked that "[i]n many cases, the academic literature is divided on an issue, so the Court took one side" (Clive R. Belfield and Henry M. Levin, The Economics of Education on Judgment Day, 28 J Educ Fin 183, 185 [Fall 2002]). Of course, trial courts do this all the time, but usually not when determining what a constitutional standard means or whether it has been violated.
[4] These risks were recognized at the time by Judge Levine, who concurred in CFE I, and by Judge Simons, who dissented. Judge Levine carefully tracked the trial and intermediate appellate progress of Levittown. He noted that both lower courts had found violations of the Education Article by applying constitutional standards remarkably similar to the template announced by the majority in CFE I, yet in Levittown we held as a matter of law that plaintiffs and intervenors had not established a constitutional violation. Judge Levine worried that the majority's interpretation of the Education Article might be read to reject Levittown so as to "invite[] and inevitably * * * entail the subjective, unverifiable educational policy making by Judges, unreviewable on any principled basis" (CFE I, 86 NY2d at 332). Judge Simons harbored no doubt that the majority had strayed from Levittown, observing that "[o]f course, the majority may interpret the State Constitution, or our Levittown decision, as mandating a level of student performance and authorizing judicial determination of the curriculum and facilities and State funding necessary to achieve that level if it chooses, but I believe it unwise to do so * * *" (id. at 341).
[5] In Paynter v State of New York (100 NY2d 434, 441 [2003] [decided today]), we observe that "[t]he causes of academic failure may be manifold, including such factors as the lack of family supports and health care. But if the State truly puts adequate resources into the classroom, it satisfies its constitutional promise under the Education Article, even though student performance remains substandard" (emphasis supplied). If "outputs" are irrelevant as long as funding is adequate, it seems inconsistent for the majority here to look to the same outputs to measure whether the "sound basic education" standard has been met in the first place.
[6] Judge Smith, of course, straightforwardly embraces the RLSs.
[7] This stands in marked contrast to Kentucky, the state always cited as the success story for school finance reform litigation (see Rose v Council for Better Educ., Inc., 790 SW2d 186 [Ky 1989]). In the 1980's Kentucky ranked forty-eighth among the states in per pupil and per capita expenditures on public schools (see Molly A. Hunter, All Eyes Forward: Public Engagement and Educational Reform in Kentucky, 28 J L & Educ 485 [Oct. 1999]). In the 1980's Kentucky also "was fiftieth among the states in adult literacy and adults with high school diplomas, [and] forty-ninth in college-going rate * * *. [I]n the Appalachian counties over 48% of the population was functionally illiterate" (id. at 486). The Kentucky Supreme Court in Rose declared the State's entire statutory framework for the common schools unconstitutional; that is, for example, statutes or regulations bearing on teacher certification as well as those bearing on finance.
[8] For this reason as well as the sheer relative size of the New York City school district, I view the majority's forbearance from a statewide remedy, which Judge Smith would straightforwardly adopt, as illusory in practical effect as is the majority's standard to define a sound basic education.
[9] Paynter is instructive on the point of whether increased funding is a panacea for poor educational outcomes. According to the Paynter plaintiffs at oral argument, the Rochester City School District has had the highest paid teachers in the state since 1997, all of whom are certified, as well as new buildings and books, yet graduates only 26% of its students. Thus the Paynter plaintiffs claimed no funding inadequacy. The Rochester City School District, however, filed an amicus curiae brief on this appeal, stating that it "continues to suffer from grossly inadequate State and local funding" (brief at 16).
[10] For example, as part of a comprehensive effort to improve special education, "long * * * the source of the most intractable and costly of the city's education ills," the Chancellor plans to streamline the screening process by eliminating an additional review at the school district level, which would free up 960 educational evaluators for teaching at least half-time (David M. Herszenhorn, Bloomberg and Klein Have Plan to Improve Special Education, New York Times, Apr. 4, 2003, at D7, col 1). The New York City public school system devotes at least a quarter of its budget to special education.
[11] This type of litigation does not appear on a "blank slate" in terms of our national experience (see, e.g., Robinson v Cahill, 62 NJ 473, 303 A2d 273 [1973]; Robinson II, 63 NJ 196, 306 A2d 65 [1973]; Robinson III, 67 NJ 35, 335 A2d 6 [1975]; Robinson IV, 69 NJ 133, 351 A2d 713 [1975]; Robinson V, 69 NJ 449, 355 A2d 129 [1976]; Robinson VI, 70 NJ 155, 358 A2d 457 [1976], mod 70 NJ 464, 360 A2d 400 [1976]; Abbott v Burke, 100 NJ 269, 495 A2d 376 [1985]; Abbott II, 119 NJ 287, 575 A2d 359 [1990]; Abbott III, 136 NJ 444, 643 A2d 575 [1994]; Abbott IV, 149 NJ 145, 693 A2d 417 [1997]; Abbott V, 153 NJ 480, 710 A2d 450 [1998]; Abbott VI, 163 NJ 95, 748 A2d 82 [2000], clarified by Abbott VII, 164 NJ 84, 751 A2d 1032 [2000]; Abbott VIII, 170 NJ 537, 790 A2d 842 [2002]; Abbott IX, 172 NJ 294, 798 A2d 602 [2002]; DeRolph v State, 78 Ohio St 3d 193, 677 NE2d 733 [1997]; DeRolph II, 89 Ohio St 3d 1, 728 NE2d 993 [2000]; DeRolph III, 93 Ohio St 3d 309, 754 NE2d 1184 [2001]; DeRolph IV, 97 Ohio St 3d 434, 780 NE2d 529 [2002]; DeRolph V [sub nom. State ex rel. State v Lewis], 99 Ohio St 3d 97, 789 NE2d 195 [2003]).